# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 13-1407

KENNEN DANIEL

VERSUS

POINT TO POINT DIRECTIONAL DRILLING, INC.

**********

APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION – DISTRICT 3
PARISH OF CALCASIEU, NO. 11-03297
CHARLOTTE L. BUSHNELL, WORKERS' COMPENSATION JUDGE

**********

## JIMMIE C. PETERS
## JUDGE

**********

Court composed of John D. Saunders, Jimmie C. Peters, and Billy Howard Ezell, Judges.

**AFFIRMED IN PART AS AMENDED;
REVERSED IN PART; AND RENDERED.**

Eric J. Waltner
Allen & Gooch, A Law Corporation
P. O. Box 81129
Lafayette, LA 70598-1129
(337) 291-1400
COUNSEL FOR DEFENDANTS/APPELLANTS:
    Point to Point Directional Drilling, Inc.
    The Gray Insurance Company

**Mark Zimmerman**
**4216 Lake Street**
**Lake Charles, LA 70605**
**(337) 474-1644**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
    **Kennen Daniel**

**PETERS, J.**

The defendants, Point to Point Directional Drilling, Inc. and The Gray Insurance Company, appeal from a workers' compensation judgment awarding the plaintiff, Kennen Daniel, medical treatment for his work-related mental injury, penalties and attorney fees, and full reimbursement for his past medical treatment. For the following reasons, we reverse that part of the judgment awarding reimbursement to Blue Cross/Blue Shield for amounts paid for Mr. Daniel's medical treatment; amend the judgment to award Mr. Daniel $2,000.00 in penalties for the defendants' failure to reimburse Mr. Daniel his out-of-pocket expenses, and affirm the remainder of the judgment as amended. Additionally, we award Mr. Daniel an additional $5,000.00 in attorney fees for work performed on appeal.

## DISCUSSION OF THE RECORD

On June 27, 2008, Point to Point Directional Drilling, Inc. (Point to Point), a Welsh, Louisiana drilling company, employed Kennen Daniel as a laborer. On that day, Mr. Daniel, who was nineteen years old, was involved in a multiple-vehicle accident near Newton, Texas. While there exists no dispute over the fact that Mr. Daniel was in the course and scope of his employment with Point to Point at the time of the accident, the facts of the accident are necessary to explain the disability issue before the court.

At approximately 9:20 p.m. on June 27, 2008, Mr. Daniel and his crew chief were traveling to Welsh from a Texas job, and eastbound on U.S. Highway 190 near Newton, Texas. Each was driving a company truck, and Mr. Daniel was in the lead and pulling a trailer. Approximately one mile west of the crash site, an erratically driven vehicle passed Mr. Daniel. Soon thereafter, the vehicle crossed the centerline of the highway, sideswiped a westbound truck and trailer, and then struck another truck and trailer head-on, before coming to rest in the eastbound

lane. To avoid the accident taking place immediately before him, Mr. Daniel veered into the westbound lane and struck the first truck hit by the erratically driven vehicle. His vehicle then came to rest in the eastbound lane, at which time Mr. Daniel found himself trapped in the wreckage of his truck. Approximately twenty minutes later, his crew chief was able, with the use of his truck, to rip off the truck's door and steering wheel to free him.

Immediately Mr. Daniel and other Point to Point employees began assisting the other trapped wreck victims. While attempting to assist these other individuals, Mr. Daniel encountered the wreckage of the other vehicles and observed the horribly severed corpse of the precipitating driver, the severely crushed driver of the truck hit head on, a screaming passenger, as well as other victims. Approximately thirty minutes later, emergency-response personnel reached the scene and took over the rescue operation. By this time, Mr. Daniel was obviously overcome with what he had experienced, and his crew chief directed him to sit down away from the wreckage. An ambulance subsequently transported him to a hospital in Jasper, Texas. When he arrived at the hospital at approximately 11:05 p.m., the emergency room personnel treated him for facial and left arm lacerations, a left corneal abrasion, and contusions on both knees. He was then released to return home.

Within two weeks of the accident, Mr. Daniel began experiencing the symptoms of Post-Traumatic Stress Disorder (P.T.S.D.), including nightmares, survival guilt, and insomnia. In order to cope with his overwhelming emotions, he began drinking heavily and abusing illegal and prescription drugs. While continuing to work for Point to Point after the accident, Mr. Daniel sought treatment for his symptoms at the Institute for Neuropsychiatry (Institute) in Lake

Charles, Louisiana. However, he did not effect a workers' compensation claim for his medical condition. Instead, he sought payment of the treatment from his parents' health insurance policies.

Mr. Daniel's first appointment at the Institute occurred on April 22, 2009, and Nurse Practitioner Sarah Hairgrove oversaw his treatment from that date through his discharge on November 23, 2010. Ms. Hairgrove diagnosed Mr. Daniel as suffering from Bipolar Disorder, co-morbid with substance abuse, and P.T.S.D. Initially he responded to treatment and was released to work without restrictions on June 10, 2009. However, on May 20, 2009, Point to Point terminated Mr. Daniel's employment based on a failed drug test. Mr. Daniel continued his relationship with the Institute until he was discharged by Ms. Hairgrove on November 23, 2011. The reason for his discharge from the Institute was his failure to comply with his medication treatment and to attend his appointments and therapy sessions.

However, even before the Institute discharged him from its care, Mr. Daniel sought other treatment for his condition. On July 8, 2009, he checked himself into G & G Holistic Addiction Treatment, Inc. (G & G), a North Miami Beach, Florida drug-rehabilitation center. The treatment team at G & G diagnosed Mr. Daniel as suffering from Bipolar Disorder and P.T.S.D., as had the Institute, but added alcohol and cannabis dependence to that diagnosis. The records from G & G indicate that Mr. Daniel's substance abuse/dependence was his primary problem, and his P.T.S.D. and Bipolar Disorder were secondary. Although Mr. Daniel entered G & G's intensive residential program, he only stayed enrolled eighteen days. On July 26, 2009, G & G discharged him as a patient for his non-compliance with his treatment.

3

Nine months and two days later, on April 28, 2011, Mr. Daniel sought treatment for his drug-dependency problems from New Beginnings at Lake Charles, LLC (New Beginnings), an addiction treatment and rehabilitation center. The initial diagnosis at New Beginnings was that of opiate, cocaine, cannabis, and sedative/hypnotic drug dependency. However, Mr. Daniel could not maintain the program requirements at New Beginnings, either. On May 16, 2011, he was released from New Beginnings against medical advice and, the next day, sought a psychiatric evaluation at Calcasieu Oaks Behavior Clinic (Calcasieu Oaks), a Lake Charles psychiatric hospital. His initial diagnosis at Calcasieu Oaks was Bipolar Disorder, poly-substance abuse, and depression. He remained at Calcasieu Oaks until May 24, 2011, at which time he returned to New Beginnings. However, the next day, he left New Beginnings against medical advice.

In addition to the treatment provided by these health care providers, Mr. Daniel also received treatment from his family physician, Dr. Mark E. Clawson, a Jennings, Louisiana family practitioner, from Yvonne H. Krielow, a nurse practitioner at The Clinic of Welsh, LLC, and the Lake Charles Memorial Hospital and Jennings American Legion Hospital emergency rooms. On numerous occasions, his mental condition required that he be transported to and from the facilities by ambulance.

By certified mail dated April 26, 2011, Mr. Daniel's counsel made demand on Point to Point for medical treatment and indemnity benefits related to his June 27, 2008 work-related accident. When Point to Point did not affirmatively respond to this demand, on May 2, 2011, he filed a disputed claim against Point to Point seeking a judgment for indemnity and medical benefits, penalties and attorney fees, and interest for the work-related injuries he suffered as a result of the June 27,

4

2008 accident. Point to Point and its insurer, The Gray Insurance Company (hereinafter referred to collectively as Point to Point), filed pleadings denying Mr. Daniel's entitlement to either indemnity or medical benefits and further asserted that his right to indemnity benefits had prescribed. As an alternate defense, Point to Point asserted that Mr. Daniel had forfeited his right to benefits pursuant to the fraud statutes, La.R.S. 23:1208 and/or La.R.S. 23:1208.1. Following a hearing, the workers' compensation judge (WCJ) granted Point to Point's exception of prescription as to the indemnity benefits. The WCJ executed a written judgment to this effect on August 27, 2012, and this issue is not before us.

The matter proceeded to a trial on the merits on May 2, 2013. At the start of the trial, the parties stipulated that the June 28, 2007 accident occurred during the course and scope of Mr. Daniel's employment with Point to Point and that the only issues to be resolved pertained to medical benefits. Upon completion of the evidentiary phase of the trial, the WCJ took the matter under advisement. Thereafter, on September 26, 2013, the WCJ rendered oral reasons for judgment finding that Mr. Daniel suffered a mental injury as a result of his work-related accident and that his allegedly fraudulent statements did not reach the level required for proving fraud under the Louisiana Workers' Compensation Act. The WCJ further held that Point to Point was not entitled to the $750.00 cap for non-authorized medical treatment provided for in La.R.S. 23:1142 and ordered it to reimburse Blue Cross/Blue Shield in full for any medical benefits it paid pursuant to La.R.S. 23:1205.[1] Finally, the WCJ awarded Mr. Daniel $2,000.00 in penalties based on Point to Point's failure to pay medical benefits and $10,000.00 in attorney fees.

---

[1] Blue Cross/Blue Shield of Texas was his father's health insurer. Blue Cross/Blue Shield of Louisiana was his mother's health insurer.

Subsequently, Mr. Daniel filed a motion for new trial to address the issue of reimbursement for the out-of-pocket expenses paid by his mother for his treatment. However, following Point to Point's petition for a suspensive appeal, he voluntarily dismissed that motion and, instead, raised the issue in his answer to the appeal.

On appeal, Point to Point raises six assignments of error:

1.  It was legal or manifest error to deny 23:1208 when the claimant admitted at trial that he lied in his deposition because he thought that if he told the truth it would hurt his Worker's [sic] Compensation claim;

2.  It was legal or manifest error to deny 23:1208 given the misrepresentations to the medical providers;

3.  The court applied the wrong standard in evaluating whether there had been a violation of 23:1208;

4.  It was legal or manifest error to not apply 23:1212 and to Order reimbursement to health insurance, a nonparty, of 100% of their payments;

5.  It was legal or manifest error to find that 23:1142 was inapplicable;

6.  It was legal or manifest error to award penalties and attorney's fees[.]

In his answer to appeal, Mr. Daniel raises four assignments of error:

1.  Clarification of the judgment awarding medical benefits.

2.  Additional $2,000.00 penalty for failure to reimburse $4,500.00 out-of-pocket-expense paid to G & G Holistic.

3.  Litigation Expenses.

4.  Additional attorney fees for work done on Appeal.

**OPINION**

It is well settled that an appellate court reviews the factual findings of a workers' compensation judge pursuant to the manifest error—clearly wrong

6

standard of review. *Poissenot v. St. Bernard Parish Sheriff's Office*, 09-2793 (La. 1/9/11), 56 So.3d 170. Additionally, a question of law is reviewed by determining if the workers' compensation judge's ruling is legally correct or incorrect. *Magbee v. Fed. Express*, 12-77 (La.App. 3 Cir. 12/12/12), 105 So.3d 1048.

### *Fraud*

Point to Point's first three assignments of error all question the correctness of the WCJ's denial of its La.R.S. 23:1208 fraud defense. Its first assignment is based on Mr. Daniel's admission that he testified untruthfully during his deposition because he felt the truth would hurt his claim. Its second assignment is based on his inaccurate statements to the medical providers regarding his pre-accident drug use. In its third assignment, Point to Point argues that the WCJ applied the wrong standard for finding no violation of La.R.S. 23:1208. Since all three assignments are related, we will address them together.

The fraud provision at issue is found in La.R.S. 23:1208, which provides in part:

> A. It shall be unlawful for any person, for the purpose of obtaining or defeating any benefit or payment under the provisions of this Chapter, either for himself or for any other person, to willfully make a false statement or representation.
> . . . .
>
> E. Any employee violating this Section shall, upon determination by workers' compensation judge, forfeit any right to compensation benefits under this Chapter.

In *Jim Walter Homes, Inc. v. Guilbeau*, 05-1473, pp. 5-6 (La.App. 3 Cir. 6/21/06), 934 So.2d 239, 243, this court cited the parameters applicable to the La.R.S. 23:1208 fraud defense:

> Under the unambiguous and clear language of the statute, an employer claiming that an employee has violated La.R.S. 23:1208 must prove "that (1) there is a false statement or representation, (2) it is willfully made, and (3) it is made for the purpose of obtaining or

defeating any benefit or payment." *Resweber v. Haroil Constr. Co.*, 94-2708, p. 7 (La.9/5/95), 660 So.2d 7, 12. If the WCJ finds that all three of "these requirements are met, Section 1208 applies and its forfeiture provisions must be enforced." *Id.* at 14.

The determination by a WCJ as to whether a claimant has made a false statement, willfully, for the purpose of obtaining workers' compensation benefits is a finding of fact, and is, therefore, subject to the manifest error standard of review. *Phillips v. Diocese of Lafayette*, 03-1241 (La.App. 3 Cir. 3/24/04), 869 So.2d 313. However, we must keep in mind that La.R.S. 23:1208(E) is penal in nature. Any statute that is penal in nature must be strictly construed in favor of the one receiving benefits under that chapter of the law. *Fontenot v. Reddell Vidrine Water Dist.*, 02-439 (La.1/14/03), 836 So.2d 14; *Olander v. Schillilaegh's*, 04-725 (La.App. 3 Cir. 3/23/05), 899 So.2d 97.

The evidentiary record establishes that despite his young age at the time of the June 28, 2008 accident, Mr. Daniel had a significant substance use and abuse history. In fact, Dr. Clawson's[2] medical records establish that on October 5, 2000, he diagnosed Mr. Daniel as suffering from attention deficit disorder and prescribed Adderall. At the time, Mr. Daniel was eleven years old. When Mr. Daniel was fourteen years old, Dr. Clawson saw Mr. Daniel for a personal consultation following the divorce of his mother and father. At that time, Dr. Clawson prescribed Strattera, an attention-deficit/hyperactivity-disorder medication to Mr. Daniel. Two years later, in September of 2005, Dr. Clawson's medical record indicates that he prescribed Lexapro to Mr. Daniel for depression. However, his handwritten note stated that the Strattera had begun to cause Mr. Daniel to feel depressed, and the change of medication was in response to that complaint. This change of medication was added to the Adderall, and Mr. Daniel was instructed to return in one month.

During high school, Mr. Daniel began consuming alcohol, and he experimented with marijuana, mushrooms, ecstasy, and perhaps other illegal substances. The fraud defense is raised because of the contradictory statements by

---

[2] Dr. Clawson has previously been identified as Mr. Daniel's family physician.

8

Mr. Daniel concerning the extent of his alcohol and illegal substance use prior to the June 28, 2008 accident.

During direct examination at trial, Mr. Daniel testified that the nature of his drug and alcohol use prior to June of 2008, was occasional or recreational. Additionally, he denied ever using cocaine prior the accident. He did not recall if he denied a social use of drugs to the emergency room personnel immediately after the accident, but also suggested that he was overwhelmed from the circumstances of the accident at that particular time.

With regard to the extent of his past substance abuse, Mr. Daniel had stated in his deposition that he smoked marijuana approximately fifteen times during high school, but denied using any other type of illegal substances prior to the accident. However, the records of New Beginnings indicated that when he participated in the initial assessment process on April 28, 2011, he related a history of having consumed a twelve pack of beer per week beginning at the age of fifteen; smoking half an ounce of marijuana and snorting half an ounce of cocaine daily since the age of seventeen; and ingesting two to three pills of ecstasy on weekends since turning eighteen years of age. On May 10, 2011, a subsequent chemical use/mental health intake form was completed indicating that Mr. Daniel began drinking at the age of fifteen and that he mostly drank beer and bourbon during his high school years; that he tried mushrooms one time at the age of sixteen; and that he began using Hydrocodone, Roxicodone, methadone, and, once or twice, ecstasy at the age of eighteen. The form further states that Mr. Daniel began using marijuana daily at age seventeen, which varied between a half and one ounce daily beginning in June of 2008. Finally, it states that Mr. Daniel began using cocaine at the age of nineteen and that his use became problematic between June of 2008 and

9

January of 2009.[3]   Additionally, Mr. Daniel, in an undated Treatment Plan Assignment, wrote that his use of alcohol began at fifteen, marijuana at seventeen, and cocaine at eighteen.

When confronted with the New Beginnings records at trial, Mr. Daniel admitted that he began smoking a gram of marijuana every day or every other day when he was seventeen and that both his one-time-mushroom use at sixteen and his one-to-two-time-ecstasy use at eighteen were accurate.  However, he was adamant that he never used cocaine until two weeks after the June 28, 2008 accident or that he used Hydrocodone, Roxicodone, or methadone when he was eighteen years old. When questioned why the New Beginnings' records indicated that his cocaine use began at eighteen, he admitted that he had taken several substances prior to his admission into New Beginnings and that he was probably high at the time this information was gathered from him.  In fact, an April 29, 2011 blood test revealed that he tested positive for Benzodiazepine, cocaine, methadone, and marijuana.[4]

Ms. Hairgrove testified that when Mr. Daniel entered the Institute, he described his prior drug use as sporadic, and he stated that only after the accident did he begin using on a daily basis.  Based on the description provided her, she concluded that Mr. Daniel was a recreational user of alcohol and marijuana. However, when confronted with the New Beginnings records, she stated that his drug use prior to the accident was clearly greater than what he had reported to her.

With regard to his prior marijuana use, Mr. Daniel testified that it existed as a near-daily rate for approximately two years prior to his employment with Point to

---

[3] Notably, this use began near or after the time of the accident at issue in this litigation.

[4] This finding was despite the fact that the technician's assessment at the time was that Mr. Daniel was calm; fully oriented; had an appropriate affect and intact linear thought process and memory; and that his cognitive function, abstraction, and insight at the time of the intake process was normal.

Point and that he stopped using marijuana one month prior to high school graduation in order to pass the drug screening test for employment. When asked why in his deposition he reported using marijuana only fifteen times during high school, Mr. Daniel stated that he answered as he did because of nervousness. After his answer, the following exchange occurred between him and Point to Point's counsel:

> **Q.** Sir, when you say "nervousness", were you nervous about how it would affect your case if you told me that you used marijuana before the accident at that frequency?
>
> **A.** Repeat the question?
>
> **Q.** Yes, sir. When you say you didn't tell me because of nervousness, were you nervous that if you told me the truth about how much marijuana you used before the accident, that it may hurt your workers' compensation case?
>
> **A.** In all honesty, yes.

With regard to when his depression began, Mr. Daniel testified at trial that he could not recall when or if he was diagnosed with depression prior to his work accident. When asked whether he had been prescribed anti-depression medication before the accident, he stated that he did not know.[5]

Having all this evidence before it, the WCJ, in denying Point to Point's fraud defense, stated:

> The Court does not find that this case reaches the level of severity to show fraud for the purposes of collecting workers' compensation benefits. This accident was bad and we see few events that are as gruesome and brutal. For these reasons, judgment is rendered in favor of the claimant and against the defendant.

After reviewing the record, we find no error in the WCJ's denial of Point to Point's fraud allegations. With regard to Mr. Daniel's statements to the medical providers, we find that those statements regarding his pre-accident drug use, even

---

[5] At his deposition, Mr. Daniel denied ever being diagnosed or treated for depression.

if inaccurate, were not made for the purpose of obtaining workers' compensation benefits. In fact, all of the statements made to the health care providers concerning his past history were made before the filing of his workers' compensation claim.

In *Resweber v. Haroil Construction Co.*, 94-2708, p. 10 (La. 9/5/95), 660 So.2d 7, 14 (emphasis added), the seminal case on La.R.S. 23:1208, the supreme court, in comparing the application of La.R.S. 23:1208 to La.R.S. 23:1208.1 (previous injuries), stated:

> We therefore hold that Section 1208 applies to any false statement or misrepresentations, including one concerning a prior injury, made willfully by a claimant for the purpose of obtaining benefits, and thus is generally applicable once an accident has allegedly occurred *and* a claim is being made. Section 1208.1, on the other hand, applies to false statements or misrepresentations made pursuant to employment-related inquiries regarding prior medical history such as in an employment application or some post-employment questionnaire and not to statements made in relation to a pending claim.

Accordingly, we find no error in the WCJ's denial of Point to Point's fraud defense based on any allegedly inaccurate statements made by Mr. Daniel prior to his claim for compensation.

We likewise find no error with regard to Mr. Daniel's statements during his trial testimony. Mr. Daniel admitted that he misrepresented his pre-accident drug use in his deposition testimony. His reason for the inaccuracy was his nervousness. However, nervousness does not equate to willfulness. We further find that it was reasonable for the WCJ to discount Mr. Daniel's response to the suggestion proposed by defense counsel for the cause of his nervousness. Although Point to Point claims that Mr. Daniel willfully lied in order to obtain workers' compensation benefits, we note that his response was to a question framed by defense counsel which prompted that specific statement and, in considering Mr. Daniel's fragile mental state, all he has been through subsequent to his horrifying

12

work accident, and his relatively young age (twenty-two years at the time of his deposition), it was not unreasonable for the WCJ to find that he was, in fact, nervous about revealing the full extent of his prior drug use.

We further find that any discrepancy between Mr. Daniel's statements regarding a prior depression diagnosis were inadvertent and inconsequential. Mr. Daniel was sixteen years old on the date in question, and Dr. Clawson's records do not contain a definitive depression diagnosis at that time. Accordingly, we find that any discrepancy between his deposition and trial testimonies did not result in a willful misrepresentation made for the purpose of obtaining workers' compensation benefits.

Finally, we find no merit in Point to Point's argument that the WCJ applied an inappropriate standard in finding no violation of La.R.S. 23:1208. The standard applied in such cases is as follows:

> Once it has been determined that a false statement or representation has been made, the WCJ must make a factual determination as to whether, based on the record, the statement or representation was willfully made "specifically to obtain benefits, and thus to defraud the workers' compensation system," such that benefits should be forfeited. *Issa v. LL & G Const., Inc.*, 02-1215, p. 8 (La.App. 1 Cir. 3/28/03), 844 So.2d 912, 917, *writ denied*, 03-1875 (La.10/31/03), 857 So.2d 480.

*Fontenot v. State ex rel. Dep't of Health and Hosps.*, 12-1265, p. 4 (La.App. 1 Cir. 4/2/13), 116 So.3d 695, 698, *aff'd in part; rev'd in part on other grounds*, 13-1004 (La. 9/13/13), 123 So.3d 161.

Although Point to Point argues that the WCJ's use of the term "severity" in its oral reasons for judgment in effect heightens its burden of proof from a preponderance of the evidence to something more stringent, we disagree with its assertion—establishing the level of fraud or the purpose or intent behind the statement has always been required as part of the standard applicable by the WCJ.

In addressing the type of statements that result in forfeiture of benefits, the *Resweber* court explained:

> However, [plaintiff] argues that, if read as written, the statute is too broad because it will result in the forfeiture of benefits for any false statement that is made, regardless of how inconsequential. This argument fails to recognize that the statute does not require the forfeiture of benefits for any false statement, but rather only false statements that are *willfully made for the purpose of obtaining benefits.* It is evident that the relationship between the false statement and the pending claim will be probative in determining whether the statement was made willfully for the purpose of obtaining benefits. A false statement which is inconsequential to the present claim may indicate that the statement was not willfully made for the purpose of obtaining benefits. Clearly, an inadvertent and inconsequential false statement would not result in forfeiture of benefits.

*Resweber*, 660 So.2d at 16.

With this standard in mind, as clarified by *Resweber*, it is reasonable to find that the WCJ did not believe Mr. Daniel's inaccurate statements rose to the level of fraud, fraud in this context meaning willfully made for the purpose of obtaining benefits, so as to subject him to forfeiture pursuant to La.R.S. 23:1208. Accordingly, we find no merit in the first three assignments of error, and we affirm the judgment of the WCJ denying Point to Point's fraud defense.

### La.R.S. 23:1212

In its fourth assignment of error, Point to Point argues that the WCJ erred by failing to apply the provisions of La.R.S. 23:1212 and by ordering it to reimburse Blue Cross/Blue Shield, a non-party, for one hundred percent of the benefits it paid in relation to Mr. Daniel's treatment pursuant to La.R.S. 23:1205.

Louisiana Revised Statutes 23:1205(B) provides:

> Any company which contracts for health care benefits for an employee shall have a right of reimbursement against the entity responsible for the payment of workers' compensation benefits for such employee if the company paid health care benefits for which such entity is liable. The amount of reimbursement shall not exceed the amount of the entity's liability for the workers' compensation

14

benefit. In the event the company seeks recovery for such in conjunction with a claim against any other party brought by the employee, the company may be charged with a proportionate share of the reasonable and necessary costs, including attorney fees, incurred by the employee in the advancement of his claim or suit.

Louisiana Revised Statutes 23:1212, on the other hand, provides:

A. Except as provided in Subsection B, payment by any person or entity, other than a direct payment by the employee, a relative or friend of the employee, or by Medicaid or other state medical assistance programs of medical expenses that are owed under this Chapter, shall extinguish the claim against the employer or insurer for those medical expenses. This Section shall not be regarded as a violation of R.S. 23:1163. If the employee or the employee's spouse actually pays premiums for health insurance, either as direct payments or as itemized deductions from their salaries, then this offset will only apply in the same percentage, if any, that the employer of the employee or the employer of his spouse paid the health insurance premiums.

B. Payments by Medicaid or other state medical assistance programs shall not extinguish these claims and any payments made by such entities shall be subject to recovery by the state against the employer or insurer.

Although the provisions of these statutes are conflicting, La.R.S. 23:1205(B) has been held to provide a specific exception to the general rule under La.R.S. 23:1212. Thus, any insurance company which contracts to provide health benefits to an employee, and who provided such benefits, has a right of reimbursement from any party responsible for providing workers' compensation benefits for the employee. *Chailland Bus. Consultants v. Duplantis*, 03-2508, 03-2509 (La.App. 1 Cir. 10/29/04), 897 So.2d 117, *writ denied*, 04-2922 (La. 2/4/05), 893 So.2d 878; *Ryan v. Blount Bros. Constr.*, 40,845 (La.App. 2 Cir. 4/19/06), 927 So.2d 1242, *writ denied*, 06-1219 (La. 9/15/06), 936 So.2d 1272; *see also Oliver v. City of Eunice*, 11-1054 (La.App. 3 Cir. 6/6/12), 92 So.3d 630, *writ denied*, 12-1570 (La. 10/12/12), 98 So.3d 874.

15

Still, in the matter before us, we find that the WCJ erred in ordering Point to Point to reimburse Blue Cross/Blue Shield for any benefits it paid as Mr. Daniel's health insurer. Blue Cross/Blue Shield has not intervened in this matter and, therefore, is not a party to this suit. We note that in the case relied on by Mr. Daniel, the health insurer intervened in the workers' compensation claim. *Noe v. Basile Police Dep't*, 12-333 (La.App. 3 Cir. 11/7/12), 103 So.3d 689. Accordingly, we reverse that portion of the WCJ's judgment which awards reimbursement to a non-party.

### *La.R.S. 23:1142*

In its next assignment of error, Point to Point argues that the WCJ erred in finding that the provisions of La.R.S. 23:1142 were inapplicable to this matter. It argues that this finding is manifestly erroneous under the factual scenario presented because it provided Mr. Daniel medical treatment immediately after the accident for his left knee and because its May 11, 2011 answer admits that the accident was work-related and that no denial of medical benefits had occurred. It further relies on a May 26, 2011 letter to Mr. Daniel's counsel, in which its counsel advised:

> As to medical benefits, I understand that there have been no denials but rather that the company does not have any information that medical benefits have been received or sought since 2008. As such, please be advised that reasonable, necessary and related medical benefits are being approved. Please produce copies of medical records since July of 2008 which evidence the reasonableness, necessity and relatedness of any medical benefits being sought. Also please advise what doctors the plaintiff wishes to treat with for these issues.

Finally, Point to Point notes that it stipulated in its October 20, 2011 pretrial statement that there was an accident within the course and scope of Mr. Daniel's employment, "with some injury[,]" and that all submitted medical bills had been

16

"correctly and timely paid subject to 23:1142b and the health insurance credit issue[.]"

Mr. Daniel testified that he did not obtain pre-authorization from Point to Point because he and his parents were only focused on him receiving help for his mental condition and drug dependency. Furthermore, he stated that he was not even aware that his mental injury qualified as a work-related injury.

Brenda Guillot, the adjustor on this claim, first testified that Mr. Daniel's request for medical benefits was not denied by Point to Point, as evidenced by its May 13, 2011 answer, which states:

16.

Defendants, **POINT TO POINT DIRECTIONAL DRILLING, INC.** and **THE GRAY INSURANCE COMPANY**, show that the averment on the lawsuit that medical benefits have been denied is incorrect and as such it is denied.

However, when confronted with allegations denying the existence of a work-related injury or his entitlement to medical benefits, Ms. Guillot admitted that Point to Point initially denied Mr. Daniel's request based on a lack of supporting medical evidence and because of his pre-accident drug use and pre-existing mental condition.[6] Still, she suggested that although Point to Point's pleadings denied Mr. Daniel's claim, she never specifically denied his claim.

---

[6] The following allegations were included in Point to Point's answer:

3.
Defendants . . . admit that on June 16, 2008 the claimant was in the course and scope of the employment when involved in an accident; the existence or occurrence of injury therein, however, is denied for lack of information sufficient to justify a belief therein.

7.
Defendants . . . deny that the claimant has sustained an injury and/or a loss of earnings capacity for lack of information sufficient to justify a belief therein. Defendants require strict proof of any and all allegations.

8.

Despite its initial denial, Ms. Guillot testified that Point to Point paid the $750.00 cap to Lake Charles Memorial Hospital, New Beginnings, the Jennings American Legion Hospital, and G & G and $485.00 to the Institute for Neuropsychiatry. She further admitted that the amount owed pursuant to the workers' compensation fee schedule to each of these health care providers would exceed the statutory cap. In response to questioning from the WCJ, she stated that Point to Point limited the reimbursement to these providers to the cap amount because no prior approval was obtained for the treatment provided. During direct examination, she explained that the La.R.S. 23:1142 rule was invoked because "[w]e, as an insurance company . . . we don't want to be cold or anything to that sort per se." However, when pressed for the factual reasoning behind the application, she stated, "If there's no pre-approval of non-emergency charges, they are assessed at a $750 cap."

Louisiana Revised Statutes 23:1142(B) places a $750.00 cap on costs for non-emergency diagnostic testing or treatment received by an employee in the absence of the employer's prior approval of the testing/treatment. However, no such cap exists when the provided health care arose from an emergency situation or when the employer denies that the employee's claim is compensable. La.R.S. 23:1142(C) and (E).[7]

---

Defendants . . . deny that the claimant is entitled to receive . . . medical benefits or any other workers' compensation benefits whatsoever for lack of information sufficient to justify a belief therein. Defendants require strict proof of any and all allegations.

[7] The exception to the $750.00 cap based on the employer's denial of compensability is provided by La.R.S. 23:1142(E):

> Exception. In the event that the payor has denied that the employee's injury is compensable under this Chapter, then no approval from the payor is required prior to the provision of any diagnostic testing or treatment for that injury.

18

In *Carradine v. Regis Corp.*, 10-529 (La.App. 3 Cir. 11/3/10), 52 So.3d 181, which Mr. Daniel relies on and Point to Point quotes from extensively, this court held that the exception provided by La.R.S. 23:1142(E) applies even in instances where the employee undergoes pre-claim, unauthorized medical treatment if the employer denies that the employee's injury is compensable. In applying the statute to the facts before it, the court stated:

> Our decision to apply the exception in La.R.S. 23:1142(E) to unauthorized medical expenses incurred before the employee decides to claim workers' compensation benefits ensures that claimants in this situation are not unnecessarily deprived of reimbursements for medical services which the employer is typically required to furnish. Next, no employer who accepts that the employee has suffered a compensable injury is deprived of the opportunity to participate in the decision about what medical services will be furnished. Finally, no employer is automatically deprived of the opportunity to take advantage of the statutory cap created in La.R.S. 23:1142(B); employers in this situation are simply required to choose between disputing compensability and limiting their liability under the statutory cap.

*Id.* at 193.

In applying the La.R.S. 23:1142(E) exception to this matter, the WCJ held that Point to Point initially denied Mr. Daniel's claim and, for that reason, it could not rely on the $750.00 cap in repaying those medical expenses he incurred prior to his compensation claim. As this is a finding of fact, it is reviewed pursuant to the manifest error standard of review. *Poissenot*, 56 So.3d 170.

After reviewing the record, we find that it was reasonable for the WCJ to conclude that Point to Point did, in fact, initially deny the compensability of Mr. Daniel's claim. We further find that although the facts in this matter vary slightly from those presented in *Carradine*, that ruling still applies to deny Point to Point's application of the cap. Mr. Daniel did receive medical treatment immediately following the June 28, 2008 accident for the cuts and bruises he experienced

during the actual collision. However, because he never sought workers' compensation benefits prior to obtaining unauthorized treatment for his mental injury, it was reasonable for the WCJ to find the medical-expense cap inapplicable based on Point to Point's initial denial of his claim.

Furthermore, because the WCJ was presented with conflicting evidence pertaining to whether Point to Point denied Mr. Daniel's claim, her finding on that issue is not manifestly erroneous. Accordingly, the WCJ's judgment finding that Point to Point is not entitled to the $750.00 cap for non-authorized medical treatment is affirmed.

### *Penalties and Attorney Fees*

In its final assignment of error, Point to Point argues that the award of penalties and attorney fees pursuant to La.R.S. 23:1201(E) was contrary to the law and the evidence because Mr. Daniel's medical expenses were paid by his father's health insurer, because he failed to obtain pre-authorization for that treatment, and because once it was aware of his claim, its adjustor "worked diligently to obtain the medical bills and to pay each of the providers $750[.]" Finally, it argues that because it reasonably relied on its fraud defense, Mr. Daniel's claim was reasonably controverted.

The penalty and attorney fee provisions in La.R.S. 23:1201, at the time of Mr. Daniel's work accident, provided in part:

> E. Medical benefits payable under this Chapter shall be paid within sixty days after the employer or insurer receives written notice thereof.

> F. Except as otherwise provided in this Chapter, failure to provide payment in accordance with this Section or failure to consent to the employee's request to select a treating physician or change physicians when such consent is required by R.S. 23:1121 shall result in the assessment of a penalty in an amount up to the greater of twelve percent of any unpaid compensation or medical benefits, or fifty

20

dollars per calendar day for each day in which any and all compensation or medical benefits remain unpaid or such consent is withheld, together with reasonable attorney fees for each disputed claim; however, the fifty dollars per calendar day penalty shall not exceed a maximum of two thousand dollars in the aggregate for any claim. The maximum amount of penalties which may be imposed at a hearing on the merits regardless of the number of penalties which might be imposed under this Section is eight thousand dollars. An award of penalties and attorney fees at any hearing on the merits shall be res judicata as to any and all claims for which penalties may be imposed under this Section which precedes the date of the hearing. Penalties shall be assessed in the following manner:

(1) Such penalty and attorney fees shall be assessed against either the employer or the insurer, depending upon fault. No workers' compensation insurance policy shall provide that these sums shall be paid by the insurer if the workers' compensation judge determines that the penalty and attorney fees are to be paid by the employer rather than the insurer.

(2) This Subsection shall not apply if the claim is reasonably controverted or if such nonpayment results from conditions over which the employer or insurer had no control.

(3) Except as provided in Paragraph (4) of this Subsection, any additional compensation paid by the employer or insurer pursuant to this Section shall be paid directly to the employee.

(4) In the event that the health care provider prevails on a claim for payment of his fee, penalties as provided in this Section and reasonable attorney fees based upon actual hours worked may be awarded and paid directly to the health care provider. This Subsection shall not be construed to provide for recovery of more than one penalty or attorney fee.

(5) No amount paid as a penalty or attorney fee under this Subsection shall be included in any formula utilized to establish premium rates for workers' compensation insurance.

In *Carradine*, 52 So.3d at 194, this court stated that:

A claim for benefits has been reasonably controverted when the employer "engaged in a nonfrivolous legal dispute or possessed factual and/or medical information to reasonably counter the factual and medical information presented by the claimant throughout the

21

time he refused to pay all or part of the benefits allegedly owed." *Brown v. Texas-LA Cartage, Inc.*, 98-1063, p. 9 (La.12/1/98), 721 So.2d 885, 890. The decision to impose penalties and attorney fees is essentially a factual issue subject to the manifest error or clearly wrong standard of review. *Authement v. Shappert Eng'g*, 02-1631 (La.2/25/03), 840 So.2d 1181.

Ms. Guillot provided several excuses for Point to Point's failure to comply with La.R.S. 23:1201(E): Its reliance on La.R.S. 23:1142; its belief that Mr. Daniel's current problems were not work-related as his drug use and some mental problems predated the accident; and its allegations of fraud. Pursuant to the La.R.S. 23:1142 statutory cap, she stated that Point to Point paid $750.00 to Lake Charles Memorial Hospital, New Beginnings, the Jennings American Legion Hospital, the Institute, and G & G.

Ms. Guillot testified that she was not aware of Mr. Daniel's claim until he filed his disputed claim in April of 2011. She admitted that she learned nothing further about his claim until Point to Point's counsel provided her with the subpoenaed medical records. Ms. Guillot agreed that a nurse case manager is normally assigned to a claim to assist in obtaining medical information and in determining the appropriateness of medical treatment. However, she stated that this claim was not normal because all of Mr. Daniel's treatment occurred before Point to Point was even aware of his claim. Ms. Guillot further defended the lack of a nurse case manager by explaining that she lacked the authority to assign such a person and because the assistance garnered from a nurse case manager was rendered moot since the treatment had already been provided. Although she admitted that she had a hard time following this claim, she stated that a nurse case manager would have experienced the same difficulty.

At the start of the trial, the parties stipulated that Mr. Daniel sought penalties and attorney fees on only two issues: (1) Point to Point's failure to reimburse the

22

$4,500.00 co-pay for his treatment from G & G; and (2) Point to Point's application of the $750.00 cap pursuant to La.R.S. 23:1142(B) to the health care providers. In her oral reasons for judgment, the WCJ stated that Mr. Daniel was entitled to a penalty of $2,000.00 and an attorney fee of $10,000.00 based on Point to Point's failure to pay the medical benefits.

The evidence reveals that Mr. Daniel faxed a request for payment of medical expenses to Point to Point's counsel on November 16, 2011. The health care providers listed in the request are: Lake Charles Memorial Hospital; Jennings American Legion Hospital; the Institute; Calcasieu Oaks; New Beginnings; Acadian Ambulance; and Walgreens. The request states that the actual medical records for these providers were already in Point to Point's possession.

On October 2, 2012, Mr. Daniel faxed another request for payment of medical expenses to Point to Point's counsel, which listed outstanding balances of $239.96 and $81.94 for Calcasieu Oaks and the Institute, respectively. On December 10, 2012, he faxed a statement from G & G to Point to Point's counsel, which listed an outstanding balance of $3,641.21.

The payment history introduced by Point to Point lists the amounts and the dates The Gray Insurance Company paid the health care providers in Mr. Daniel's workers' compensation claim:

1. Acadian Ambulance Services: $1,032.72 on March 1, 2012.

2. Jennings American Legion Hospital: $750.00 on November 10, 2011.

3. Southwest Louisiana Hospital Association d/b/a Lake Charles Memorial Hospital: $750.00 on November 28, 2011.

4. Acadian Ambulance Services: $660.05 on January 17, 2012.

5. Institute for Neuropsychiatry: $375.00 on January 10, 2012.

23

In *Carradine*, 52 So.3d at 194, we held that an employer's reliance on the statutory cap provided by La.R.S. 23:1142(B) was a "nonfrivolous legal dispute, as it is jurisprudentially supported." However, we stated that this reliance does not justify the employer's failure to reimburse the employee for emergency care received or the first $750.00 of non-emergency diagnostic testing or treatment provided by each health care provider.

In this matter, Point to Point's reliance on the statutory cap is supported as it is a nonfrivolous legal dispute. Based on the medical records and the payment history introduced into evidence, we find that Point to Point was put on notice regarding the medical expenses by Mr. Daniel's November 16, 2011 letter. While its $750.00 payments to Jennings American Legion Hospital and Lake Charles Memorial Hospital were within the sixty-day period allowed by La.R.S. 12:1201(E), its payment to the Institute was not timely. Moreover, there is no record of any payment to Calcasieu Oaks or G & G. While Ms. Guillot stated that she paid $750.00 to G & G and $458.00 to the Institute for Neuropsychiatry, her testimony is not substantiated by any documentation with regard to G & G and is only substantiated as to $375.00 with regard to the Institute.

We further find reasonable the WCJ's implied finding that Point to Point failed to reasonably controvert Mr. Daniel's claim. Despite Ms. Guillot's complaint regarding the length of time between the provision of medical treatment and her receipt of the associated medical records, we note that Mr. Daniel was still undergoing treatment at New Beginnings on the date he filed his disputed claim and that he would not enter Calcasieu Oaks until fifteen days after he filed his claim. "The employer or compensation insurer has a duty to investigate and make every reasonable effort to assemble and assess factual and medical information in

order to ascertain whether the claim was compensable before denying benefits." *Delatte v. Pala Grp., LLC*, 09-913, p. 12 (La.App. 1 Cir. 2/10/10), 35 So.3d 291, 299, *writ denied*, 10-562 (La. 5/7/10), 34 So.3d 865. In this instance Point to Point did nothing to investigate Mr. Daniel's claim. Rather, it relied on its fraud defense to deny payment of his medical expenses. However, it fraud defense was based on information it could not have possessed until after it obtained his deposition and the medical records it relied on. Accordingly, we affirm the WCJ's award of penalties and attorney fees.

## *ANSWER TO APPEAL*

### *Clarification of Medical Expenses*

In his first assignment of error, Mr. Daniel seeks clarification of the WCJ's award of medical benefits. The WCJ held that Mr. Daniel proved that his mental injury was work-related and that he was entitled to medical benefits. However, Mr. Daniel argues that the judgment failed to specify whether the medical benefits awarded included reimbursement of his out-of-pocket expenses of $4,500.00 for his co-pay, his mileage to G & G in Florida, and $585.00 he paid to the Institute.

On October 2, 2012, Mr. Daniel faxed a request for reimbursement of payments he made to the Institute in the amount of $585.00. This was followed by an October 22, 2012 request for reimbursement of his out-of-pocket expenses of $21.91 for travel insurance, $438.10 for air fare, and a $4,500.00 co-pay for his treatment from G & G. During the trial, Mr. Daniel introduced evidence establishing that the distance from his home to G & G in Lake Worth, Florida was 964 miles one way. Furthermore, Mr. Daniel's mother, Kimberly Fox, testified that she charged the $4,500.00 co-pay to her credit card, which she has since paid off.

Ms. Guillot admitted that Mr. Daniel was not reimbursed the $4,500.00 co-pay because, she said, it is "uncustomary for us to reimburse any out-of-pocket expense under the workers' compensation statutes." She further stated, "I do not reimburse out of pocket or anything off a bank statement or Visa statement or anything of that such. I would have to reimburse the facility."

Based on the WCJ's award of medical benefits and our affirmation of the denial of Point to Point's fraud defense, we find that Mr. Daniel is entitled to reimbursement of his out-of-pocket expenses, including the $4,500.00 co-pay, his payments to the Institute, and mileage to and from Florida. Based on this finding, we further award Mr. Daniel an additional $2,000.00 in penalties based on Point to Point's failure to reimburse him for the $4,500.00 co-pay within the sixty days allowed by La.R.S. 23:1201(E).

*Litigation Expenses*

In his next assignment of error, Mr. Daniel seeks a clarification that the court costs assessed by the WCJ to Point to Point includes the litigation expenses incurred by him in prosecuting his claim. These expenses, which were introduced into evidence by Mr. Daniel during the trial, consist of court-reporter and medical-record costs. In her oral reasons for judgment, the WCJ simply stated, "Costs are to be paid by the defendant." The September 23, 2013 written judgment echoes that statement.

Pursuant to La.R.S. 13:4533, which provides that the "costs of the clerk, sheriff, witness' fees, costs of taking depositions and copies of acts used on the trial, and all other costs allowed by the court, shall be taxed as costs[,]" we find that Mr. Daniel's litigation expenses are included in the costs that the WCJ assessed to Point to Point. Accordingly, we amend the WCJ's judgment to reflect

26

that the costs to be paid by Point to Point includes the $682.11 in litigation expenses.

*Additional Attorney Fees*

In his final assignment of error, Mr. Daniel seeks additional attorney fees for work performed by his counsel in defense of Point to Point's appeal. Considering the success his counsel has achieved in defending this judgment on appeal, we find that Mr. Daniel is entitled to an additional $5,000.00 in attorney fees.

## DISPOSITION

For the foregoing reasons, we reverse the judgment of the workers' compensation judge awarding reimbursement to Blue Cross/Blue Shield; we render judgment to award Mr. Daniel $2,000.00 in penalties based on Point to Point's failure to reimburse his $4,500.00 out-of-pocket expense; we amend the judgment to clarify that the medical-benefit award includes reimbursement of Mr. Daniel's $4,500.00 and $585.00 out-of-pocket expenses, his mileage to and from Florida, and the inclusion of the $682.11 litigation expense in the costs assessed to Point to Point; and we affirm in all other respects. We further award Mr. Daniel an additional $5,000.00 in attorney fees for work performed on appeal.

**AFFIRMED IN PART AS AMENDED; REVERSED IN PART; AND RENDERED.**

27