| | | |
|---|---|---|
| **CEMBELL INDUSTRIES, INC. & THE GRAY INSURANCE COMPANY** | * | **NO. 2024-CA-0348** |
| | * | |
| | | **COURT OF APPEAL** |
| **VERSUS** | * | |
| | | **FOURTH CIRCUIT** |
| **KEVIN SMITH** | * | |
| | | **STATE OF LOUISIANA** |

* * * * * * *

APPEAL FROM
THE OFFICE OF WORKERS' COMPENSATION
NO. 20-00597, DISTRICT "08"
HONORABLE Catrice Johnson-Reid, The Office of Workers' Compensation
* * * * * *
**Judge Rosemary Ledet**
* * * * * *

(Court composed of Judge Joy Cossich Lobrano, Judge Rosemary Ledet, Judge Sandra Cabrina Jenkins)

**JENKINS, J., CONCURS IN PART AND DISSENTS IN PART WITH REASONS.**

Azelie Ziegler Shelby
Sarah K. Lunn
SHELBY LAW FIRM
3070 Teddy Drive
Baton Rouge, LA 70809

      COUNSEL FOR PLAINTIFFS/APPELLANTS

Jean-Marc V. Bonin
Alexandre E. Bonin
R. Christian Bonin
BONIN LAW FIRM
4224 Canal Street
New Orleans, LA 70119

      COUNSEL FOR DEFENDANT/APPELLEE

        **AFFIRMED; ANSWER TO APPEAL DENIED**
        **February 11, 2025**

This is a workers' compensation case. The principal issue presented on appeal is whether the workers' compensation judge ("WCJ") erred in denying the fraud-forfeiture claim, under La. R.S. 23:1208, filed by the employer and its insurer—Cembell Industries, Inc., and The Gray Insurance Company (collectively "Cembell"). After a trial on the merits, the WCJ ruled partially in favor of the employee—Kevin Smith—finding he did not violate La. R.S. 23:1208. The myriad of other issues presented by Cembell's appeal and Mr. Smith's answer to the appeal are discussed elsewhere in this opinion. For the reasons that follow, we affirm and deny the answer.

### FACTUAL AND PROCEDURAL BACKGROUND

Cembell formerly employed Mr. Smith as a hydro tester. In August 2015, Mr. Smith injured his lower back when he and several co-workers were attempting to lift a blind weighing over 200 pounds. According to Mr. Smith, he pulled a muscle in his back. Mr. Smith continued working for Cembell for one week after the accident. He has not returned to work since then.[1]

---

[1] At the time of the accident, Mr. Smith had been working for Cembell for about nine years.

Following the accident, Cembell, without admitting liability, paid Mr. Smith indemnity—temporary total disability ("TTD")—and medical benefits through January 2020.[2] At that time, Cembell filed a Disputed Claim for Compensation (LWC-WC-1008 form) (the "1008 Form").[3] In the 1008 Form, Cembell averred that Mr. Smith had committed workers' compensation fraud in violation of La. R.S. 23:1208.[4] In a supplemental petition, filed contemporaneously with the 1008 Form, Cembell averred as follows:

- On May 14, 2019, [Mr. Smith] was released to return to work with restrictions.

- [Gray] provided vocational rehabilitation services. On August 29, 2019, [Mr. Smith] was notified of two jobs that were approved by Dr. Neil Jolly [Mr. Smith's treating pain-management physician] and available.

- On July 20, 2019, [Mr. Smith] was involved in a motor vehicle accident wherein, he later claimed, his back and hip pain worsened as a result.

- On August 17, 2019, [Mr. Smith] was seen by his physician, Dr. Samer Shamieh. [Mr. Smith] did not report his July 20, 2019 motor vehicle visit [sic] to Dr. Shamieh on this visit, or that he injured his back or hip

---

[2] Before his benefits were terminated, Mr. Smith had a total left hip replacement surgery in May 2016. His treating physician provided him with a walker. Mr. Smith also had a lumbar fusion in April 2018.

[3] Cembell also filed a Form 1002 terminating Mr. Smith's benefits on January 23, 2020.

[4] La. R.S. 23:1208 provides, in pertinent part:

> A. It shall be unlawful for any person, for the purpose of obtaining or defeating any benefit or payment under the provisions of this Chapter, either for himself or for any other person, to willfully make a false statement or representation.
>
> * * *
>
> E. Any employee violating this Section shall, upon determination by workers' compensation judge, forfeit any right to compensation benefits under this Chapter.

3

in this accident. Further, [Mr. Smith] stated that he had to use a cane for mobility.[5]

- On November 5, 2019, [Mr. Smith] was seen by Dr. Jolly at Louisiana Pain Specialists. [Mr. Smith] reported to Dr. Jolly that he had to use a cane for mobility.

- On November 15, 2019, [Mr. Smith] was again seen by Dr. Samer Shamieh at DISC of Louisiana. [Mr. Smith] again reported that he had to use a cane for mobility.

- [Cembell] ha[s] surveillance video and photographs of [Mr. Smith] that contradict his purported physical limitations and inability to ambulate without assistance.

Based on these averments, Cembell contended that Mr. Smith had violated La. R.S. 23:1208, forfeiting his right to workers' compensation benefits. Alternatively, Cembell contended that Mr. Smith's July 20, 2019 motor vehicle accident (the "MVA") was a superseding, intervening cause of his alleged injuries and disability status.

In response to Cembell's filings, Mr. Smith filed an answer and a reconventional demand. He denied that he committed workers' compensation fraud and asserted that Cembell owed him indemnity and medical benefits from the date of termination—January 23, 2020. He further asserted that Cembell was arbitrary and capricious in terminating his benefits, entitling him to penalties and attorney's fees under La. R.S. 23:1201.

A one-day trial was held in June 2021. At trial, the parties entered into the following stipulations:

---

[5] This paragraph—Paragraph 23 of Cembell's supplemental petition—was the subject of both a motion to strike filed by Mr. Smith and a motion to dismiss filed by Cembell. Cembell, however, did not file its motion until two days before the trial—on June 7, 2021. Cembell filed its motion once it determined that the allegations in this paragraph were factually unsupported, stating in its motion "[Cembell] ha[s] learned through discovery that [Mr. Smith] did not attend an appointment with Dr. Shamieh on August 17, 2019. Cembell cannot meet [its] burden of proof regarding the allegations in this paragraph and wish to narrow the issues in dispute for trial." The WCJ granted Cembell's motion.

1. [Mr.] Smith was an employee of Cembell Industries, Inc. on or about August 25, 2015 [the date of the work-related accident];

2. Without admitting liability, Cembell Industries, Inc. accepted [Mr.] Smith's workers' compensation claim as compensable and paid him indemnity and medical benefits;

3. [Mr.] Smith's average weekly wage was $1,113.98;

4. [Mr.] Smith's workers' compensation rate was the maximum at the time of the accident, $603.00;

5. [Mr.] Smith's medical and indemnity benefits were terminated on January 23, 2020;

6. [Mr.] Smith underwent a left total hip arthroplasty on May 24, 2016;

7. [Mr.] Smith underwent an L4-5 ALIF/PLF [fusion] on April 4, 2017;

8. On April 16, 2019, [Mr.] Smith was released to return to work with restrictions by his treating physicians; and

9. [Mr.] Smith was in a motor vehicle accident on July 20, 2019.

The events that occurred between April 16, 2019—when Mr. Smith's treating physicians released him to return to work with restrictions—and January 23, 2020—when Cembell terminated Mr. Smith's benefits—were the focus of the trial. The following five witnesses testified at trial:

- Mr. Smith, who was called as Cembell's witness;

- Susan Davidson, who was Cembell's vocational rehabilitation counselor and who was qualified as an expert in that field;

- Tracy Knight, who was a certified private investigator who, while working for Southern Surveillance Company ("Southern"), took the surveillance videos of Mr. Smith's activities;

- Sherman Cravins, who owned Southern and who prepared the surveillance reports; and

- Mary Farrar, who was Gray's senior claims adjuster responsible for controverting Mr. Smith's claim and who made the decision to terminate his benefits.

5

Additionally, the parties introduced various exhibits, including Mr. Smith's medical records; Mr. Smith's December 15, 2020 deposition; Southern's surveillance videos, still photographs, and surveillance reports; and photographs from Mr. Smith's Facebook page.

Because the crux of Cembell's fraud-forfeiture claim is the surveillance-video evidence, we briefly outline it here.[6] The record reflects that, following the MVA, Cembell hired Southern to conduct video surveillance of Mr. Smith's activities. Mr. Knight, on Southern's behalf, conducted surveillance of Mr. Smith on multiple days, including the following six days in 2019: August 22, August 27, August 29, August 30, November 8, and November 26. Short surveillance videos taken by Mr. Knight on each of those days were introduced into evidence. Mr. Knight explained that he also prepared field notes, which he transmitted to Mr. Cravins. Using Mr. Knight's field notes and viewing the surveillance videos, Mr. Cravins drafted the surveillance reports, which were sent to Cembell.

Mr. Knight testified that on August 22, 2019, at about 1:00 p.m., he observed Mr. Smith on the front porch of his house. Mr. Smith lifted his legs over a "pet" gate, grabbed the gate with his left arm, and then walked down the steps. Mr. Knight testified that Mr. Smith had nothing in his hand—neither a cane nor a walker. Although Mr. Knight could not see how many steps the porch had, Mr. Knight later returned to Mr. Smith's house and counted the steps. The porch had seven steps.

---

[6] For ease of discussion, we summarize the other pertinent trial evidence elsewhere in this opinion.

Five days later, on August 27, 2019, at about 7:15 a.m., Mr. Knight returned to Mr. Smith's house. He observed Mr. Smith leaving in his vehicle. At about 8:30 a.m., Mr. Knight observed Mr. Smith walk into the office building in which Select Physical Therapy's office was located. Mr. Smith walked up the steps and entered the door to Select Physical Therapy. He neither used the rail, nor had a cane.

Two days later, on August 29, 2019, at about 10:30 a.m., Mr. Knight arrived at Mr. Smith's house. At 11:00 a.m., Mr. Smith entered his vehicle and drove to a car wash. Mr. Knight presumed that Mr. Smith did not enter the car wash because Mr. Smith's vehicle never exited it. On the following day, August 30, 2019, at 10:00 a.m., Mr. Knight arrived at Mr. Smith's house. Neither Mr. Smith nor his vehicle were present. At about 12:15 p.m., Mr. Smith returned home.

About two months later, on November 8, 2019, at about 7:30 a.m., Mr. Knight arrived at Mr. Smith's house. At about 11:30 a.m., Mr. Knight followed Mr. Smith to Capital One Bank. Mr. Knight observed Mr. Smith exit his vehicle and walk across the parking lot. Mr. Smith walked without using his cane, and he was looking at his phone while he was walking. Mr. Smith entered the bank. Because he was blocking the parking lot, Mr. Knight had to move his vehicle. When he returned to the parking lot three minutes later, Mr. Smith had departed.

About three weeks later, on November 26, 2019, at about 7:30 a.m., Mr. Knight arrived at Mr. Smith's house. Mr. Smith and his vehicle remained at his home until about 2:30 p.m. when Mr. Knight observed Mr. Smith depart in his vehicle. Mr. Smith picked up a passenger—an older man. Mr. Knight followed them to Walmart. At about 2:45 p.m., they arrived at Walmart. Mr. Knight observed Mr. Smith walk into Walmart by himself without using a cane. Mr. Smith stayed inside Walmart for about ten minutes. Mr. Smith exited Walmart pushing an

ordinary shopping cart containing two grocery bags and two cases of Dasani water. Mr. Smith unloaded the bags of groceries and placed them in the back of his vehicle. He then lifted the cases of water, one after the other, from the shopping cart and placed them into the rear of his vehicle.

After departing from Walmart, Mr. Smith traveled to his church, arriving at about 3:00 p.m. Mr. Smith climbed the steps to his church "to about the second-to-last step, and [then] he grab[ed] the handrail." After about thirty minutes, Mr. Smith exited the church. Mr. Knight testified that "it look[ed] like [Mr. Smith was] on his phone, looking at something on his phone. And the gentleman look[ed] at it with him. [Mr. Smith] grab[bed] the handrail, and he [took] his hand off halfway down and ke[pt] looking at his phone." After driving away from the church, Mr. Smith dropped off his passenger.

Mr. Knight filmed Mr. Smith drive home and open the gate to his driveway. When Mr. Knight turned around to get into position, he observed that the two cases of water already had been moved to the front porch of Mr. Smith's house. Because Mr. Knight did not see any other person in the area, he presumed Mr. Smith had placed the cases of water on the porch. Mr. Knight testified that "it was my logical deduction that there was no one else there helping him. . . . The water had to be unloaded, and so it was my deduction that he had put the water there."[7] Then, Mr. Knight saw Mr. Smith walk up the steps, but he was unable to film him due to the camera delay. At that point, Mr. Smith realized Mr. Knight was there and pointed at him. Believing that "the integrity of the case was compromised," Mr. Knight ceased all surveillance.

---

[7] The surveillance reports, as noted elsewhere in this opinion, inaccurately state that Mr. Smith carried the cases of water from his vehicle, up his stairs, and to his porch.

On March 4, 2022, the WCJ issued a judgment and written reasons for judgment. The WCJ found as follows:

- Mr. Smith did not commit fraud pursuant to La. R.S. 23:1208;

- Mr. Smith's July 20, 2019 automobile accident was not a superseding, intervening accident;

- Mr. Smith did not comply with the requirements set forth in La. R.S. 23:1102; he did not obtain written approval from Cembell at the time of or before the settlement of his third-party lawsuit;

- Mr. Smith forfeits his rights to workers' compensation benefits due to his failure to obtain approval to his third-party settlement and must "buy back" his right to future workers' compensation benefits before being paid any future medical or indemnity benefits;

- Mr. Smith has not proven that he is currently disabled from work or unable to earn ninety (90%) of his pre-injury wages due to the work accident;

- Cembell has proven that Mr. Smith has a post-accident wage earning capacity of $1,733.33 per month and that earning capacity was effective August 28, 2019 until present. Cembell is entitled to a credit for the overpayment of benefits during the period of August 28, 2019 until the termination of benefits on January 23, 2020; and

- As a result of Cembell's arbitrary and capricious actions, Mr. Smith was awarded penalties in the amount of $8,000 and attorney's fees in the amount of $16,000 pursuant to La. R.S. 23:1201(I).

Thereafter, Cembell filed a motion for new trial seeking clarification of three issues. Granting the motion in part, the trial court, on July 21, 2022, rendered judgment finding as follows on each of those three issues:

- The March 4, 2022 judgment was not inconsistent with its findings of fact regarding the ruling that Mr. Smith is unable to earn 90% of his pre-injury wages due to the work accident;

- The March 4, 2022 judgment is corrected and amended to specify an amount—$2,631.09 with interest from the date of judgment—as it relates to the credit for Cembell's overpayment of benefits during the

9

period of August 28, 2019 until termination of benefits on January 23, 2020;[8] and

- The March 4, 2022 judgment insofar as it finds Mr. Smith forfeited his rights to workers' compensation benefits due to his failure to obtain approval to his third-party settlement stands.

From these two judgments, Cembell appeals; and Mr. Smith answers the appeal.

## STANDARD OF REVIEW

This Court, in *Safford v. New Orleans Fire Dep't*, 23-0495, pp. 23-25 (La. App. 4 Cir. 2/1/24), 384 So.3d 909, 927-28, summarized the standard of review in workers' compensation cases as follows:

- [A]n appellate court applies the manifest error/clearly wrong standard of review even when the tribunal's decision is based solely upon written reports, records, or depositions.

- When applying this standard of review, the appellate court determines whether the trier of fact's conclusion was reasonable, not whether the trier of fact was right or wrong.

- If the factfinder's findings are reasonable in light of the record reviewed in its entirety, then the appellate court may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. This is because [w]here there are two permissible views of the evidence, a factfinder's choice between them can never be manifestly erroneous or clearly wrong.

- If the workers' compensation judges' findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact's findings because only the factfinder can be aware of the variations of demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said.

- However, if legal error interdicts the fact-finding process in a workers' compensation proceeding, then the appellate court applies the de novo standard of review instead. That is, if the appellate court finds that a reversible error of law or manifest error of material fact was made in

---

[8] The calculation was as follows: "21 weeks x $125.29 = $2,631.09."

the trial court, then the appellate court must redetermine the facts de novo from the entire record and render a judgment on the merits.

- Similarly, the appellate court applies the de novo standard of review in workers' compensation matters if the issue concerns interpretation of statutes because this constitutes a question of law for which the appellate court must determine if the ruling was legally correct.

*Id.* (reformatted, internal quotations, citations, and parenthetical omitted).

## DISCUSSION

To address the myriad of issues raised on appeal,[9] we group them into the following six categories: (i) fraud forfeiture, under La. R.S. 23:1208; (ii) penalties and attorney's fees under La. R.S. 23:1201; (iii) superseding, intervening accident; (iv) settlement forfeiture and "buy back" under La. R.S. 23:1102; (v) entitlement to future benefits; and (vi) attorney's fees for opposing this appeal.

### Fraud-Forfeiture under La. R.S. 23:1208

As noted at the outset, the principal issue here is whether the WCJ erred in denying Cembell's fraud-forfeiture claim under La. R.S. 23:1208. To establish a

_____

[9] Cembell contends the WCJ erred in the following three respects:

- Finding Mr. Smith did not willfully made false statements and misrepresentations for the purpose of obtaining workers' compensation benefits in violation of La. R.S. 23:1208;

- Finding that [Mr. Smith's] July 20, 2019 [MVA] was not a superseding intervening accident that terminated [Mr. Smith's] right to medical and indemnity benefits; and

- Finding [Cembell was] arbitrary and capricious in terminating [Mr. Smith's] benefits for fraud, and awarding penalties and attorney's fees for this decision.

Answering the appeal, Mr. Smith makes the following three requests:

- The WCJ's March 4, 2022 judgment be reversed to the extent it finds Mr. Smith has not proven he is unable to earn ninety (90%) or more of his pre-injury wages, and therefore, is not entitled to Supplemental Earnings Benefits ("SEB");

- The WCJ's July 21, 2022 judgment, on the motion for new trial ("MNT"), be reversed to the extent a MNT was denied on the issue of "buy back" under La. R.S. 23:1102; and

- [Cembell] be condemned to pay additional attorney's fees to the [Mr. Smith] amassed in opposing this appeal.

11

fraud-forfeiture claim, three requirements must be satisfied: (1) a false statement or representation (a "misrepresentation"); (2) the misrepresentation is willingly made; and (3) the misrepresentation is made for the purpose of obtaining or defeating any benefit or payment. *Resweber v. Haroil Const. Co.*, 94-2708, 94-3138, p. 7 (La. 9/5/95), 660 So.2d 7, 12. These are the exclusive requirements. *Id.* The party asserting a fraud-forfeiture claim has the burden of proving all three requirements are met. *Reid-Lopez v. Alternative Serv. Concept, LLC*, 11-933, p. 5 (La. App. 5 Cir. 5/22/12), 96 So.3d 537, 539.

The Supreme Court, in *Resweber*, expounded on the type of statements that result in a fraud-forfeiture, observing:

- [La R.S. 23:1208] does not require the forfeiture of benefits for any false statement, but rather only false statements that are willfully made for the purpose of obtaining benefits.

- It is evident that the relationship between the false statement and the pending claim will be probative in determining whether the statement was made willfully for the purpose of obtaining benefits.

- A false statement which is inconsequential to the present claim may indicate that the statement was not willfully made for the purpose of obtaining benefits.

- Clearly, an inadvertent and inconsequential false statement would not result in forfeiture of benefits.

*Resweber*, 94-2708, 94-3138, p. 16, 660 So.2d at 15-16 (reformatted).

"Once it has been determined that a false statement or representation has been made, the WCJ must make a factual determination as to whether, based on the record, the statement or representation was willfully made specifically to obtain benefits, and thus to defraud the workers' compensation system, such that benefits should be forfeited." *Fontenot v. State ex rel. Dep't of Health & Hosps.*, 12-1265,

12

p. 4 (La. App. 1 Cir. 4/2/13), 116 So.3d 695, 698 (internal quotations and citations omitted).

Inherent in resolving a fraud-forfeiture claim is "a determination of whether the false representation was willfully made." *Malone-Watson v. Strategic Restaurants,* 14-1191, p. 1 (La. App. 1 Cir. 6/11/15), 176 So.3d 417, 421 (Crain, J., concurring). Willful, in this context, has been defined as "proceeding from a conscious motion of the will; voluntary; knowingly; deliberate; intending the result which actually comes to pass; designed; intentional; purposeful; not accidental or involuntary." *Lirette v. Patterson Servs., Inc.*, 05-2654, p. 6 (La. App. 1 Cir. 11/17/06), 951 So.2d 223, 227 (internal citations and quotations omitted).

Fraud-forfeiture under La. R.S. 23:1208 is a "harsh remedy and as such must be strictly construed." *Life Flight of New Orleans v. Homrighausen*, 05-2538, p. 4, (La. App. 1 Cir. 12/28/06), 952 So.2d 45, 50. Whether a fraud-forfeiture claim has been successfully established is a fact issue, reviewed under a manifest error standard. *See Calhoun v. Sanderson Farms, Inc.*, 22-0478, p. 11 (La. App. 1 Cir. 12/16/22), 357 So.3d 354, 362 (citation omitted).

In its supplemental petition, Cembell averred that it had surveillance video and photographs of Mr. Smith that contradicted his purported physical limitations and his inability to ambulate without assistance.[10] At trial, Cembell attempted to establish that Mr. Smith's statements to his physicians and to the vocational rehabilitation counselor as well as at his testimony at his deposition regarding his physical abilities were contradicted by its surveillance-video evidence.

---

[10] Although Cembell included in its Form 1008 an allegation that Mr. Smith had failed to inform his doctor of the July 20, 2019 motor vehicle accident, it moved to dismiss that allegation on the eve of trial. The record reflects that Mr. Smith notified his physician, Dr. Jolly, of the accident at the visit he attended shortly after the motor vehicle accident.

Rejecting Cembell's fraud-forfeiture claim, the WCJ found Mr. Smith "did not willfully misrepresent or provide false statements as to his physical abilities for the purpose of obtaining benefits." The WCJ further found Mr. Smith's testimony to be credible. In its detailed reasons for judgment, the WCJ outlined three topics on which Cembell's fraud-forfeiture claim was based—using a cane; lifting cases of water; and reporting of pain complaints.[11]

As to the cane-usage issue, the WCJ observed:

> [Cembell] contend[s] that claimant, [Mr.] Smith, misrepresented the way he uses his cane for ambulation. [It] contend[s] that he testified in his deposition that he uses it every day but when surveilled he was not seen using the cane.

> The court finds that the trial and deposition testimony of claimant, [Mr.] Smith, the surveillance videos and medical records all corroborate and clarify the cane usage issue. In his deposition testimony [Mr.] Smith indicates that he brings his cane everywhere, every day, however, the court believes he clarifies that he uses the cane when walking far/long distances and does not use it when he takes his pain medication. . . . [[12]]

> The video surveillances admitted at trial show claimant, [Mr.] Smith, walking short distances. The November 8, 2019 surveillance shows him walking into the bank without a cane. The November 26, 2019 video shows him walking into Walmart without a cane. [Mr.] Smith testified in his deposition that he has a special license plate or tag

---

[11] We quote the WCJ's extensive reasons on this issue here because these reasons were the basis of the court's determination not only that Cembell failed to prove its fraud-forfeiture claim, but also that Cembell was arbitrary and capricious in terminating Mr. Smith's benefits, warranting an award of penalties and attorney's fees.

[12] In his deposition testimony, when asked:

> Q. Okay. Do you currently use a walker or a cane or something to help you physically walk?
> A. Yes
> Q. Can you tell me what you use and when you use it?
> A. I use a cane.
> Q. Okay. How often do you use a cane?
> A. Well, I have the cane with me every day.
> Q. Do you use the cane every day?
> A. Not sometimes if, you know, I'm not walking too far. If it's just a little short distance, I try not to use the cane. And if I'm going to take my pain medicine, you know, I try not to walk with the cane, you know, for a little period of time. Not too long, but other than that, I have it with me.

14

for his car that allows him to park close to entrances of facilities he visits. There has been no testimony or report to show that [Mr.] Smith parked elsewhere other than in the special handicapped parking spots. In fact, the November 26, 2019 video shows that he parked in the handicapped parking spot directly by the entrance of Walmart.

Further there has been no testimony, surveillance or medical report to show the court that claimant, [Mr.] Smith, has not been using his pain medication as prescribed. In both his trial testimony and his deposition testimony he indicated that he feels more relaxed and the pain is not as severe allowing him to move freely about. . . .[13]

As to the issue of Mr. Smith's lifting two cases of water, the WCJ found one misrepresentation in a deposition was insufficient to constitute fraud, observing:

[Cembell] contend[s] that claimant, [Mr.] Smith, intentionally misrepresented when he testified at his deposition that he could not lift cases of water. [Cembell] contend[s] that the November 26, 2019 surveillance video completely contradicts his testimony about lifting cases of water. The November 26, 2019 surveillance video shows him picking up two grocery bags and two cases of Dasani water. The court does not believe that this single instance rises to the level of fraud or misrepresentation to gain workers' compensation benefits. [Mr.] Smith testified in his deposition that he shops alone most of the time because his wife suffers with depression. The court finds that this is plausible based on his testimony regarding his wife's medical condition. The Court does not believe this action was willful or deliberate.

---

[13] The WCJ quoted the following trial testimony by Mr. Smith:

Q. Okay. So let's talk about - when did you finally start feeling a little bit better?
A. When I take my pain medicine.
Q. Okay. So when you take your pain medicine, tell me how you feel.
A. I feel relaxed and the pain in my back kind of eased up enough where I can get up and move around because the majority of the time. I'm lying down or just sitting. But when I take my pain medicine, I can get u[p] and move around and go in the kitchen or whatever, you know fix me something to eat. But once the pill wear off, I'm back to the same thing again.
Q. Okay. How long does each pill give you relief for?
A. About at least four hours to six.
Q. Okay. So can you drive while you take this medicine?
A. Yeah.
Q. Okay. You feel comfortable doing that?
A. Yes.
Q. Okay. How long have you been taking this medicine?
A. Ever since my surgery.

Finally, as to reporting of pain complaints, the WCJ observed that there was no inconsistency in the medical records, stating:

> As it relates to the medical records, Mr. Smith presented to Advanced Medical Rehab on July 23, 2019 following his [MVA] on July 20, 2019. He was referred by Advanced Medical Rehab and began treating with Dr. Shoemaker on August 6, 2019. Additionally, [Mr.] Smith had been treating with and continued treating with Dr. Suneil Jolly at Louisiana Pain Specialists for the work-related accident. It appears from . . . the admitted medical records of Advanced Medical Rehab, Dr. Shoemaker, and Dr. Jolly that [Mr.] Smith saw Dr. Jolly during the time frame after his [MVA] a total of seven (7) times or once a month from July, 2019 until December, 2019. He also treated approximately thirty (30) times with Advanced Medical Rehab/Dr. Shoemaker. . . .
>
> It appears from the admitted medical records that [Mr.] Smith's subjective complaints while treating gave a value of 0 for the low back pain twenty-two of the approximately thirty visits with Shoemaker Chiropractic. The majority of these values came after he was referred to Dr. Shoemaker on August 6, 2019. It also appears from the admitted medical records that he treated once a month with Dr. Jolly and at each of those visits he rated his low back pain a value of 7 or above. [Cembell] contend[s] that [Mr.] Smith was inconsistent in his reports of pain to his medical providers, namely Drs. Shoemaker and Jolly as it relates to low back. The court does not find these to be inconsistent, the court believes the testimony of [Mr.] Smith wherein he testified that he indicated to Dr. Shoemaker that he was being treated for the back injury by Drs. Jolly and Shamieh. The court does not find that [Mr.] Smith committed fraud pursuant to Louisiana Revised Statute 23:1208.

For all these reasons, the WCJ denied the fraud-forfeiture claim.

On appeal, Cembell asserts that the WCJ's rejection of the fraud-forfeiture claim was manifestly erroneous. In support, Cembell cites the well-settled manifest-error principle that "[w]here documents or evidence so contradict a witness' story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable factfinder would not credit the witness' story, the reviewing court may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination." *Iberia Med. Ctr. v. Ward*, 09-2705, p. 14 (La. 11/30/10), 53 So.3d 421, 431 (internal citation omitted). Cembell

contends that its evidence overwhelmingly proves that Mr. Smith's excuses for his admittedly false statements are so internally inconsistent that it was manifest error for the WCJ to credit his testimony.

Focusing on Mr. Smith's statements in his deposition regarding lifting the cases of water, Cembell contends that Mr. Smith's admittedly false statements regarding this topic is, by itself, sufficient to support the fraud-forfeiture claim.[14] According to Cembell, Mr. Smith's December 2020 deposition testimony is specific as to his ability to lift a case of water. Mr. Smith testified that since his surgery—his last surgery was in 2017—he only tried to lift a case of water once, that lifting the case of water caused him too much pain, and that he never did it again. Cembell also contends that the evidence it presented—Mr. Knight's testimony—contradicted Mr. Smith's trial testimony that he was at an appointment earlier on the day he lifted the cases of water.[15] Cembell stresses that, on that day, Mr. Knight testified that the only places Mr. Smith went were to Walmart and to his church.

Cembell further contends that the sheer number of Mr. Smith's misstatements is sufficient to establish that those misstatements were willful, not inadvertent. According to Cembell, Mr. Smith misstated that he could not lift a case of water, that he needed his cane to ambulate (to walk and to climb stairs), that he needed an electric scooter to grocery shop, and that he barely left his home. Cembell contends that each of these misstatements is refuted by the surveillance-

---

[14] In support, Cembell cites two cases: *Martinez v. Boh Bros. Const.*, 03-1718 (La. App. 1 Cir. 6/25/04), 879 So.2d 850; and *Distefano v. B & P Const., Inc.*, 04-25 (La. App. 5 Cir. 5/26/04), 874 So.2d 407.

[15] The WCJ asked Mr. Smith to explain why he was "grocery shopping" that "particular time." Mr. Smith replied that he believed that he had an appointment. He stated: "I am not sure where I went, but my wife didn't go with me. So on my way home, I stopped by the Walmart myself."

videos, depicting Mr. Smith out nearly every surveillance day performing errands—shopping, visiting his church, washing his car, going to the bank, and attending a physical therapy appointment. Moreover, Mr. Smith performed all the walking and stair climbing that was videoed without using a cane. Based on the surveillance-video evidence, Cembell contends that it was manifest error for the WCJ to find Mr. Smith did not violate La. R.S. 23:1208.

Mr. Smith counters that Cembell's arguments are not supported by any evidence, that the WCJ's findings on this issue hinge on credibility calls, and that the findings were not manifestly erroneous.[16] Mr. Smith stresses that he established in his physical therapy sessions and at his 2018 functional capacity exam his ability to perform all the activities depicted in the surveillance videos, including walking without a cane and lifting a case of water. Mr. Smith contends that Cembell completely misrepresented the issue of cane-usage versus cane-necessity. Mr. Smith contends that he has never represented that he required a cane to ambulate. Mr. Smith also stresses Cembell's failure to present the surveillance-video evidence it gathered to his treating physicians for review. Nor did Cembell call any of his physicians to testify at trial or depose them. Regardless, Mr. Smith contends, as the WCJ found, that one misstatement in a deposition does not amount to fraud.

In resolving this issue, we observe, as Mr. Smith pointed out in his pre-trial memorandum, the most physical activity the surveillance videos depict Mr. Smith performing is lifting the cases of water. Moreover, the surveillance videos only

---

[16] In support, Mr. Smith cites several cases, including: *Baker v. Harrah's*, 15-0229 (La. App. 4 Cir. 3/9/16), 190 So.3d 379; *Molinere v. Vinson Guard Serv., Inc*., 05-0116 (La. App. 4 Cir. 7/13/05), 914 So.2d 566; and *Alphonso v. Bridge Terminal Transp*., 02-2768 (La. App. 4 Cir. 7/9/03), 852 So.2d 501.

depict Mr. Smith lift each case of water from the grocery basket and transfer each case to the back of his vehicle. Incorrectly, the surveillance reports, which were prepared by Mr. Cravins, state that Mr. Smith also carried the two cases of water from his vehicle, took them up the seven stairs of his house, and placed them on his porch. The trial court, during the trial, highlighted this inconsistency between the surveillance videos and the surveillance reports.[17]

Cembell's fraud-forfeiture claim is based primarily on its video-surveillance evidence. The jurisprudence has recognized that "[s]urveillance videotape may form the basis of a forfeiture under § 1208 if it directly contradicts the claimant's statements." *Franklin v. HealthSouth*, 41,458, p. 7 (La. App. 2 Cir. 9/20/06), 940 So.2d 83, 87 (internal citations omitted). But, the jurisprudence also has recognized the hazards of using such evidence. As one court observed:

> A surveillance video must be viewed with a critical eye, bearing in mind that the person making the video has been hired by a party who desires to have the subject of the video depicted in the worst light. A video film can be edited. Scenes revealing the subject favorably can be deleted. The videographer can simply not record activities which would be supportive of the subject's position.

*Jeanise v. Cannon*, 04-1049, p. 13 (La. App. 3 Cir. 2/23/05), 895 So.2d 651, 664. Echoing those same concerns, another court observed: "[e]vidence in the form of moving pictures or videotapes is approached with great caution as they show only intervals of the activities of the subject, they do not show rest periods, and they do not reflect whether the subject was suffering pain during or after the activity." *Franklin*, 41,458, p. 7, 940 So.2d at 87 (internal quotations and citations omitted).

---

[17] Although Mr. Smith admitted at trial that he put the cases of water in the grocery basket while inside Walmart, he was not asked if he moved them from the back of his vehicle to the front porch of his house. Nor was he asked why the passenger, who was seated in the vehicle, did not get out the vehicle and help him. Nor was Mr. Smith asked about the nature of the appointment that he referred to attending that day.

19

As noted elsewhere in this opinion, both parties in their briefs cite several cases in support of their respective position on the fraud-forfeiture issue. But, "the courts have properly considered each case on the individual facts presented to them on the record as a whole, and on credibility findings." *Mendoza v. Stewart & Assocs.*, 01-698, p. 8 (La. App. 5 Cir. 12/26/01), 806 So.2d 737, 742. And, the courts have observed that the "[d]etermination of the willfulness of false statements made by claimants is largely dependent on the trial court's assessment of the claimant's credibility." *Mendoza*, 01-698, pp. 8-9, 806 So.2d at 742. Analyzing the cases cited by the parties, thus, is uninstructive.

Based on the facts of this case summarized in detail in this opinion, we cannot conclude the WCJ's findings—that Mr. Smith's one misstatement in a deposition was insufficient to constitute fraud and that Mr. Smith's testimony was credible—were manifestly erroneous. Thus, Cembell's arguments regarding the fraud-forfeiture claim under La. R.S. 23:1208 are unpersuasive.

**Penalties and Attorney's Fees—La. R.S. 23:1201**

This case involves a discontinuance, rather than nonpayment, of benefits.[18] The standard by which the employer or its insurer's conduct for a discontinuance of benefits is evaluated is set forth in La. R.S. 23:1201(I).[19] The Supreme Court has described arbitrary and capricious behavior, in this context, as consisting of

---

[18] From the date of the accident—August 2015—until January 2020, Cembell voluntarily paid benefits to Mr. Smith.

[19] La. R.S. 23:1201(I) provides, in pertinent part:

> Any employer or insurer who at any time discontinues payment of claims due and arising under this Chapter, when such discontinuance is found to be arbitrary, capricious, or without probable cause, shall be subject to the payment of a penalty not to exceed eight thousand dollars and a reasonable attorney fee for the prosecution and collection of such claims.

"willful and unreasoning action, without consideration and regard for facts and circumstances presented, or of seemingly unfounded motivation." *Ward*, 09-2705, p. 19, 53 So.3d at 434.

In determining whether an employer acted arbitrarily and capriciously, this Court has observed that "employers must possess an articulable and objective reason to deny benefits at the time it took action." *Lentz v. City of New Orleans, Police Dep't*, 22-0500, p. 10 (La. App. 4 Cir. 12/15/22), 353 So.3d 1060, 1067 (internal quotations and citations omitted), *writ denied*, 23-00045 (La. 3/14/23), 357 So.3d 831. The test is "whether the employer can articulate an objective reason for terminating benefits at the time of the termination." *Howard v. Rio Sol Nursing Home*, 21-824, p. 9 (La. App. 3 Cir. 6/15/22), 344 So.3d 216, 223.

The jurisprudence has imposed a duty to investigate on employers. *Daniel v. Point To Point Directional Drilling, Inc.*, 13-1407, pp. 24-25 (La. App. 3 Cir. 5/7/14), 139 So.3d 613, 628. "The employer or compensation insurer has a duty to investigate and make every reasonable effort to assemble and assess factual and medical information in order to ascertain whether the claim was compensable before denying benefits." *Id.* Indeed, "[a]n insurer is required to make a reasonable effort to ascertain an employee's exact medical condition before benefits are terminated." *LeBlanc v. Excel Auto Parts*, 11-58, p. 3 (La. App. 3 Cir. 6/1/11), 67 So.3d 687, 689. Thus, "[i]f, subsequent to an initial optimistic report, an insurer receives medical information indicating continuing disability, the insurer may not blindly rely upon the earlier report to avoid penalties for arbitrary nonpayment or discontinuance of benefits without probable cause." *Id.*

The determination of whether the employer's action in terminating benefits was arbitrary and capricious is a factual one subject to the manifest error standard

of review. *See Brantley v. Delta Ridge Implement, Inc.*, 41,190, p. 13 (La. App. 2 Cir. 6/28/06), 935 So.2d 308, 317 (observing that "determination of whether an employer should be cast with penalties is a question of fact for the WCJ, whose findings shall not be disturbed on appeal absent manifest error").

Here, the WCJ, in its reasons for judgment, found that Cembell's rationale for terminating Mr. Smith's benefits for fraud was arbitrary and capricious. Challenging this finding, Cembell contends that it was not arbitrary and capricious in terminating Mr. Smith's benefits. In support, Cembell relies on the testimony of Ms. Farrar, Gray's senior claims adjuster.

At trial, Ms. Farrar testified that she was first assigned Mr. Smith's case in September 2018. According to Ms. Farrar, from August 2019 to December 2019, she gathered evidence regarding whether Mr. Smith had committed workers' compensation fraud.[20] Ms. Farrar explained the steps that she took in doing so, which included watching the surveillance videos several times, reviewing the surveillance reports in their entirety, reviewing Mr. Smith's medical records; comparing the surveillance-video evidence to the medical records and the October 2019 vocational rehabilitation report; speaking with the nurse case manager and the vocational rehabilitation counselor; and consulting with an attorney. Based on Ms. Farrar's testimony, Cembell contends that this case is similar to *Freeman v. Triad Builders*, 39,657 (La. App. 2 Cir. 5/11/05), 902 So.2d 1220.

In *Freeman*, after paying workers' compensation benefits for multiple years, the insurer obtained surveillance video to determine the employee's physical capabilities. The surveillance video showed the employee driving considerable

---

[20] The impetus for beginning this process was the July 2019 MVA.

distances and engaging in physical activity. The employee acknowledged that he misrepresented in his deposition his driving practices and that he misrepresented to his treating physician that he was unable to drive farther than the 100-yard distance from his house to his father's house. The WCJ found that the employee's misrepresentations were not willfully made and denied the employer's fraud-forfeiture claim. The WCJ awarded attorney's fees to the employee for the employer's arbitrary and capricious termination of benefits. The WCJ's rationale was that the employer and its insurer "advanced a 'highly technical' interpretation of [R.S.] 23:1208 and were overzealous in their application of the same to the facts of this case." *Freeman*, 39,657, p. 12, 902 So.2d at 1228.

On appeal, the appellate court affirmed the finding of no fraud-forfeiture, but reversed the finding of arbitrary and capricious termination of benefits. The appellate court reasoned that, at the time benefits were terminated, the employer's knowledge that the employee was engaged in physical activity that he represented he was unable to perform provided a reasonable basis for termination of benefits. *Id.* Like the employer in *Freeman*, Cembell contends that Ms. Farrar possessed knowledge that Mr. Smith was engaged in physical activity that he represented he was unable to perform, providing a reasonable basis for termination of benefits. Cembell's reliance on *Freeman* is misplaced.

Unlike the employer in *Freeman*, Cembell had no objective evidence on which to base a fraud-forfeiture claim at the time it terminated Mr. Smith's benefits—January 2020. Mr. Smith's misstatement regarding lifting the cases of

23

water was not made until almost a year later—in his December 2020 deposition.[21] Moreover, Ms. Farrar, who lacked medical expertise, made her own assessments based on her observation of Mr. Smith's activities reflected in the brief surveillance videos.[22] She compared those observations to the medical reports. She found it to be a "red flag" that Mr. Smith's medical reports indicated, during the time in question, he complained to his physicians that his pain levels were 8 or 9 out of 10. She also compared Mr. Smith's reactions, as reflected on the surveillance videos, to those of her own son who recently had back surgery. She, however, never consulted with Mr. Smith's treating physicians regarding the surveillance-video evidence.

A trio of factors supports the WCJ's finding that Cembell's termination of benefits was arbitrary and capricious. First, Ms. Farrar's failure to consult with Mr. Smith's physicians regarding the surveillance-video evidence supports the WCJ's finding that the termination of benefits was arbitrary and capricious.[23] Second, at least in one respect, the surveillance-video evidence on which Ms. Farrar relied was proven to be inaccurate.[24] Third, the initial supplemental petition that Ms. Farrar filed contemporaneously with the Form 1008 included an incorrect

---

[21] *See Daniel*, 13-1407, p. 25, 139 So.3d at 628 (observing that the employer "did nothing to investigate Mr. Daniel's claim. Rather, it relied on its fraud defense to deny payment of his medical expenses").

[22] At trial, Ms. Farrar acknowledged she had never seen Mr. Smith before watching the surveillance videos.

[23] We acknowledge, as Cembell contends, that having a physician review surveillance-video evidence may not always be necessary to justify terminating benefits. But, we find, under the facts here, the failure to do so supports the WCJ's arbitrary and capricious determination.

[24] As discussed elsewhere in this opinion, contrary to the surveillance reports, the video did not show Mr. Smith carrying the cases of water out of his vehicle and onto the front porch of his house.

averment.[25] Given this trio of factors, we cannot conclude the WCJ was manifestly erroneous in finding the termination of benefits was arbitrary and capricious. While we might have weighed the evidence differently and differently concluded, we cannot conclude the WCJ was manifestly erroneous in its conclusion. Thus, Cembell's argument regarding penalties and attorney's fees under La. R.S. 23:1201 is unpersuasive.[26]

**Superseding, Intervening Accident**

In seeking to terminate Mr. Smith's benefits, Cembell asserted in its Form 1008, as an alternative argument, that the July 20, 2019 MVA was a superseding, intervening accident, cutting off Mr. Smith's right to future benefits. Rejecting this argument, the WCJ observed:

> Beyond the fact that the accident occurred the court does not believe [Cembell] proved [Mr. Smith] was disabled as a result of the intervening accident.[27] The court believes [Mr. Smith's] testimony that the back pain initially experienced was brief in duration as it related to the automobile accident.

On appeal, Cembell argues that Louisiana jurisprudence holds that a motor vehicle accident is generally not foreseeable. Cembell points out that the evidence established that Mr. Smith was at maximum medical improvement at the time of

---

[25] The supplemental petition incorrectly averred that Mr. Smith failed to inform his treating physician of the MVA.

[26] Since Cembell did not raise an issue regarding the quantum of penalties and attorney's fees awarded, we decline to address that issue.

[27] The WCJ additionally observed:

> The court does not believe that Mr. Smith's July 20, 2019 automobile accident was a superseding, intervening event which caused disability. Under limited circumstances, an aggravation of an injury sustained in a work-related accident is compensable and obligates the employer to continue paying compensation benefits, even though the aggravation develops away from the premises and when the claimant [i]s no longer employed by the employer. According to the general rule, "natural consequences that flow from the primary injury are compensable absent intervening cause."

the motor vehicle accident. It further points out that here was no testimony establishing that Mr. Smith's lower back was more susceptible to injury. *See Kelly v. City of New Orleans*, 414 So.2d 770 (La. 1982).

Both at trial and in his deposition, Mr. Smith testified that his back pain due to the motor vehicle accident only lasted three days. In the same vein, Ms. Davidson, the vocational rehabilitation counselor, testified that Mr. Smith told her the MVA was "just a minor fender bender and he was fine." The record supports the WCJ's factual findings that Mr. Smith's back pain he initially experienced from the MVA was brief and that Cembell failed to prove Mr. Smith was disabled as a result of a superseding, intervening accident.

In addressing this issue, we find *Our Lady of the Lake Reg'l Med. Ctr. v. Mire*, 13-1051 (La. App. 1 Cir. 2/18/14), 142 So.3d 52, instructive. There, the employer raised a similar issue, claiming an intervening event—an injury as a result of lifting a golf-cart battery—was the cause of the employee's current disability claims. Rejecting the employer's claim, the appellate court observed:

> [The employer] brought out the fact that [the employee] had surgery in July 2009, reported to his doctor that his leg pain was better shortly after the surgery, but in December 2009 and March 2010, reported to his doctor that his back pain was getting worse. [The employer] questioned [the employee] regarding September 29, 2009 and November 10, 2009 notations in the records of Baton Rouge Lake Physical Therapy indicating that [the employee] reported straining his back after lifting a golf cart battery. This evidence was clearly relevant to [the employer's] assertion that [the employee's] back pain was caused by superseding/intervening events. The WCJ made a specific finding that [the employee] sustained only a short-lived aggravation to his back while lifting the battery and found as a fact that [the employee's] present back condition was related only to his work accident at [the employer].

*Our Lady of the Lake Reg'l Med. Ctr.*, 13-1051, p. 9, 142 So.3d at 58. The appellate court affirmed the WCJ's finding. *Id.* The same reasoning applies here.

26

In sum, the WCJ made a factual finding that Mr. Smith's MVA resulted only in a short-lived aggravation of his work-related back injury. We cannot conclude the WCJ's factual finding on this issue was manifestly erroneous. Thus, Cembell's argument regarding a superseding, intervening accident is unpersuasive.

**Forfeiture and "Buy Back" under La. R.S. 23:1102**

Both in his answer to the appeal and in his appellee brief, Mr. Smith contends that the WCJ erred in ordering that he "buy back" his right to future workers' compensation benefits. In his answer, Mr. Smith raises the same issue he raised in his MNT—that the WCJ's March 4, 2022 judgment lacks decretal language because it fails to state the dollar amount for which he must exercise his "buy back" right.[28] In his appellee brief, Mr. Smith contends that the WCJ erred in allowing an "expansion of the pleadings" to include the "buy back" issue. In support, he cites Cembell's failure to include the issue in any pleading. Neither of these issues have merit.

As to the "expansion of the pleadings" issue, Mr. Smith's argument, in essence, equates the "buy-back" issue to an affirmative defense that must be pled—such as the fraud-forfeiture defense under La. R.S. 23:1208. Mr. Smith emphasizes that the issue was not pleaded in Cembell's original or supplemental Form 1008 and that it was not pleaded in Cembell's answer to Mr. Smith's reconventional demand. But, no case could be found to support the argument that the settlement-forfeiture defense must be specifically pled. *Cf. Lovas v. Gallagher*

---

[28] Decretal language is defined as "the portion of a court's judgment or order that officially states (decrees) what the court is ordering and generally starts with the formula [i]t is hereby ordered, adjudged, and decreed that ...." *Jones v. Stewart*, 16-0329, p. 5 (La. App. 4 Cir. 10/5/16), 203 So.3d 384, 387 (internal quotations and citation omitted).

*Bassett Servs., Inc.*, 18-0801, p. 5 (La. App. 4 Cir. 3/20/19), 267 So.3d 129, 134

(observing that "Louisiana courts have held that an allegation of fraud in a

workers' compensation case is an affirmative defense that must be specially pled in

the answer").

Regardless, as Cembell points out, it timely raised the "buy-back" issue in

its pre-trial statement.[29] In its pretrial statement, Cembell included in its

enumeration of issues to be litigated the following three:

 (i)  whether the motor vehicle accident was a superseding and intervening cause of Mr. Smith's injuries and alleged disability;

 (ii)  whether Mr. Smith settled his third-party tort claim without advising Cembell, requiring him to "buy back" his right to future workers' compensation; and

 (iii) whether Cembell was entitled to a credit or reimbursement from the tort settlement.

Moreover, as Cembell points out, when the settlement-forfeiture and "buy-

back" issue were raised at trial, Mr. Smith's counsel's objection was not based on

expansion of the pleading; rather, his counsel's objection, which the WCJ

overruled, was based on relevancy.[30] For all these reasons, Mr. Smith's "expansion

of the pleadings" argument is unpersuasive.[31]

---

[29] LAC 40:6005(A) provides that when requested by the Court, each party to a dispute "shall file a pretrial statement". The pretrial statement "shall" include, in pertinent part, issues to be litigated and contentions. LAC 40:6007(A)(2), (3).

[30] At trial, Cembell's counsel asked Mr. Smith whether he told anyone from workers' compensation about his settlement. Mr. Smith's counsel objected. In response to the WCJ's inquiry, Mr. Smith's counsel stated "[t]he objection, this is irrelevant. It was not brought up in any of the pleadings prior to today." But, the WCJ asked Mr. Smith's counsel if he was aware that the motor vehicle accident was the "subject of the fraud" and said his client was forthright about his motor vehicle accident. Cembell's counsel then stated that she asked the question for purposes of impeachment, and the question was allowed.

[31] Given our resolution of this issue on the merits, we pretermit Cembell's argument that the "expansion of the pleadings" issue was waived by Mr. Smith's failure to raise it in his answer to the appeal. Nonetheless, we acknowledge, as Cembell points out, that there is a difference between an answer to an appeal and a cross-appeal. *See FIE, LLC v. New Jax Condo Ass'n.*, 16-0843, p. 41 (La. App. 4 Cir. 2/21/18), 241 So.3d 372, 400 (observing that "[w]hen a party files

Turning to the-decretal language issue, Mr. Smith's argument is that the WCJ's judgment is defective because it fails to state the dollar amount for which he must exercise his "buy back" right. To place this argument in context, we quote the relevant portions of the WCJ's judgments and reasons for judgments.

On this issue of "buy-back" and settlement-forfeiture under La. R.S. 23:1102, the WCJ, in its reasons for judgment, observed:

> The Louisiana Workers' Compensation Act . . . requires employees who settle third-party suits to obtain written approval of the settlement from the employer or insurer at the time of or prior to such compromise.[32] Failure to obtain such approval results in forfeiture of workers' compensation benefits. No evidence was presented at trial that the claimant, [Mr.] Smith, complied with the requirements of statute and obtained approval from [Cembell] at the time of or prior to his settlement of his third-party lawsuit. A claimant forfeits his right to workers' compensation benefits when the requirements of Louisiana Revised Statute 23:1102 have not been met. A claimant forfeits his rights to workers' compensation benefits due to their failure to obtain approval to their third-party settlement and must "buy back" his right to future workers' compensation benefits before being paid any future medical or indemnity benefits.

The WCJ's March 4, 2022 judgment provides:

> **IT IS FURTHER ORDERED, ADJUDGED and DECREED** that claimant, [Mr.] Smith, forfeits his rights to workers' compensation benefits due to his failure to obtain approval to his third party settlement

---

an answer to an appeal, as opposed to a cross appeal, the scope of review is limited to the claims expressly stated in the answer" and that "[a]n answer to an appeal operates as an appeal only of those parts of the judgment complained about, and the appellee must state the specific relief demanded").

[32] The WCJ additionally observed:

> Louisiana Revised Statutes 23:1101 *et seq*. provides guidance and requirements as it relates to third party claims. Claimant, [Mr.] Smith, had an automobile accident on July 20, 2019. Claimant, [Mr.] Smith, filed a third party lawsuit as a result of injuries he alleges due to his July 20, 2019 accident. The court does not believe that the claimant's July 20, 2019 automobile accident was a superseding, intervening event which caused disability. Employees entitled to workers' compensation benefits may simultaneously seek damages from third persons to recover damages for their compensable injury. However, the Louisiana Workers' Compensation Act requires employees to notify their employer or insurer in writing of the existence of any third-party lawsuit and the venue in which the suit is pending so that the employer and/or insurer may intervene in the third party suit.

29

and must "buy back" his right to future workers' compensation benefits before being paid any future medical or indemnity benefits.

In its written reasons for judgment on the MNT, the WCJ observed:

[Mr.] Smith was in sole possession of the information regarding the settlement amount prior to trial. The Court allowed [Mr.] Smith to present evidence at the June 6, 2022 hearing which would have clarified the total amount of [Mr.] Smith's settlement not just his portion of said settlement. The Court finds that no valid evidence has been submitted and without such, the Court cannot determine the exact 'buy-back' amount.

In its judgment on the MNT, the WCJ rejected the decretal language issue, stating:

The Court's Judgment of March 4, 2022 wherein the Court found that [Mr.] Smith forfeited his rights to workers' compensation benefits due to his failure to obtain approval to his third party settlement still stand[s] and has not been modified or amended. The Motion for New Trial is DENIED as it relates to this issue.

Contrary to Mr. Smith's contention, the WCJ's judgment does not contain a decretal-language deficiency. As the WCJ clarified in its judgment on the MNT, the original judgment simply held that there was a settlement forfeiture pursuant to La. R.S. 23:1102. As Cembell points out, the WCJ's finding on this issue was a determination that Mr. Smith's MVA was an accident caused by a "third person"[33] as provided for in La. R.S. 23:1101, *et. seq*. As a result, Mr. Smith's settlement of that claim without notifying Cembell resulted, as a matter of law, in a settlement forfeiture and, by statute, gave rise a "buy back" right. Moreover, the amount that an employee, such as Mr. Smith, is required to pay to exercise that "buy back" right is governed by statute.

---

[33] La. R.S. 23:1101(C) provides that "[f]or purposes of this Section, 'third person' shall include any party who causes injury to an employee at the time of his employment or at any time thereafter provided the employer is obligated to pay benefits under this Chapter because the injury by the third party has aggravated the employment related injury."

At the hearings on the MNT, the WCJ allowed Mr. Smith to attempt to establish his "buy-back" right. Attempting to do so, Mr. Smith's counsel offered Mr. Smith's affidavit. According to Mr. Smith, his affidavit set forth the amount he received from his personal injury settlement for the MVA. In his affidavit, Mr. Smith attested that after the deduction of attorney's fees and expenses, he received $7,330. In his answer to the appeal, Mr. Smith contends that the WCJ erred in failing to find his affidavit was credible evidence of the "buy-back" amount. But, this issue is not properly before us.

Mr. Smith's affidavit is not part of the record on appeal. As Cembell emphasizes, Mr. Smith failed to introduce his affidavit into evidence, failed to proffer his affidavit, and failed to request that the transcripts of the two MNT hearings be made part of the record on appeal. As the party seeking review of this issue, Mr. Smith was required to ensure the record was complete. *See Olson v. Olson*, 04-1137, pp. 4-5 (La. App. 5 Cir. 3/1/05), 900 So.2d 52, 54-55 (observing "[t]he appellant has the duty to secure either a transcript of the testimony or a narrative of the facts; and the inadequacy of the record, if any, is imputable to the appellant"). We conclude that Mr. Smith's argument regarding the WCJ's refusal to accept his affidavit as competent evidence of the "buy-back" amount is not properly before us. Thus, Mr. Smith's arguments regarding the settlement forfeiture and the "buy-back" issue are unpersuasive.

**Entitlement to Future Benefits**

In his answer to the appeal, Mr. Smith also argues that the WCJ's March 4, 2022 judgment is erroneous to the extent it finds that he has not proven he is unable to earn 90% or more of his pre-injury wages and, thus, is not entitled to

SEB.[34] In his MNT, Mr. Smith raised this same argument. Rejecting it, the WCJ found the March 4, 2022 judgment "was not … inconsistent with [its] findings of fact … regarding the ruling that [Mr.] Smith is unable to earn 90% of his pre-injury wages due to the work accident." The WCJ's reasoning in the judgment on the MNT, however, appears to be inconsistent with the WCJ's March 4, 2022 judgment, which states that Mr. Smith has "*not* proven that he is currently disabled from work or unable to earn ninety (90%) of his pre-injury wages due to the work accident." (emphasis supplied). For the reasons explained below, we find it unnecessary to resolve this apparent conflict.

The issue of whether Mr. Smith will be entitled to "future benefits," including future SEB, if he complies with the buy-back provision under

---

[34] In its reasons for the March 4, 2022 judgment, the WCJ observed:

> Louisiana Revised Statute 23:1221 (3) establishes that to be entitled to [SEB], the claimant must prove by a preponderance of the evidence that the work-related injury resulted in the inability to earn ninety (90%) percent or more of his pre-injury wage under the facts and circumstances of his individual case. If he meets this burden, then the burden shifts to the employer to prove, by a preponderance of the evidence that the employee was physically able to perform a certain job and the job was offered to the employee. To prove the job was available, the employer must establish by competent evidence the existence of a suitable job within the claimant's physical capabilities and within the claimant's geographical area, the amount of wages and an actual position available for that particular job at the time the claimant received notice of the job's existence.

> At trial, it was stipulated by the parties that [Mr.] Smith's treating physician, Dr. Jolly, released him back to work in a modified work status—light duty/sedentary with restrictions on lifting, standing, sitting and bending. Susan Davidson, the vocational rehabilitation counselor, testified at trial that she located several job positions within Dr. Jolly's light duty restrictions. Dr. Jolly approved two job listings that were identified. [Mr.] Smith testified at trial that he did not apply for either approved job because he felt he could not handle the jobs offered. The court finds that [Cembell met its] burden of proving through its witness, Susan Davidson, there was a suitable job within the claimant's physical capabilities and within the claimant's reasonable geographic area, the amount of wages, and an actual position was available for that particular job at the time the claimant received notice of the job's existence. [Cembell has] also proven that the claimant has a post-accident wage earning capacity of $1,733.33 per month and that earning capacity was effective August 28, 2019 until present. [Cembell is] entitled to a credit for the overpayment of benefits during the period of August 28, 2019 until the termination of benefits on January 23, 2020.

32

R.S. 23:1102 is premature. *See Coolman v. Glob. Torque Turn, Inc.*, 93-664 (La. App. 3 Cir. 2/2/94), 631 So.2d 106, 110 (observing that "[employee's h]aving failed to ["buy-back" right] prior to filing this suit against [employer and its compensation insurer], his suit is premature").[35]

In the settlement-forfeiture context, the term "future benefits" has been construed to mean "any workers' compensation benefits that became payable after the compromise." *McCallon v. Key Energy Servs.*, 20-635, p. 10 (La. App. 3 Cir. 12/15/21), 342 So.3d 1059, 1067. Here, the record is devoid of evidence of the exact settlement date. Mr. Smith, in his deposition, estimated that the settlement occurred sometime in mid-2020. But, he could not say for sure when it occurred. Thus, the record reflects only that the settlement of the MVA occurred sometime after Cembell terminated Mr. Smith's benefits—January 23, 2020—but before Mr. Smith's deposition—December 15, 2020. Given that estimate of the timing of the settlement, we construe the WCJ's judgment as equating the date of termination of benefits with the date of settlement; hence, any benefits due after the date of termination are "future benefits" for purposes of Mr. Smith exercising "buy-back" right.

In the March 4, 2022 judgment, the WCJ found that from August 28, 2019, to the date Cembell terminated Mr. Smith's benefits, January 23, 2020, Mr. Smith was entitled to SEB. As to any benefits after the termination date, the WCJ found the settlement-forfeiture provision applied and that Mr. Smith had to "buy back"

---

[35] Because Cembell had voluntarily paid TTD between August 28, 2019 and January 23, 2020, the WCJ ordered that Cembell was entitled to a credit for such overpayment. This part of the judgment—that Mr. Smith was not entitled to TTD after August 28, 2019—was not challenged on appeal. As a result, that determination is final. *See Freeman v. Elliott Co.*, 09-921, p. 11 (La. App. 5 Cir. 2/9/10), 34 So.3d 344, 350 (observing that "the determination that [the employee] is not entitled to future benefits for permanent total disability prohibits [the employee] from employing the buy-back for future permanent total disability benefits").

his entitlement, if any, to "future benefits." We agree. Any argument regarding Mr. Smith's entitlement to "future benefits" must be raised when Mr. Smith properly invokes his "buy-back" right. Mr. Smith's argument regarding his entitlement to future benefits is unpersuasive.

**Attorney's Fees for Appeal**

Answering Cembell's appeal, Mr. Smith seeks additional attorney's fees for work done on appeal. "Generally, when an award for attorney['s] fees is granted at a lower court level, additional attorney['s] fees are proper for work done on appeal." *Wilczewski v. Brookshire Grocery Store*, 08-718, p. 18 (La. App. 3 Cir. 1/28/09), 2 So.3d 1214, 1226. Here, however, both sides raised additional issues on appeal. For this reason, an additional award of attorney's fees is unwarranted. Thus, we deny Mr. Smith's request for additional attorney's fees.

<u>**DECREE**</u>

For the foregoing reasons, the judgments of the Workers' Compensation Judge are affirmed, and the answer to appeal is denied.

**AFFIRMED; ANSWER TO APPEAL DENIED**